[No. 49999–3.   En Banc.   September 27, 1984.]

THE STATE OF WASHINGTON, *Respondent*, v. LESLIE MATHE, *Petitioner*.

*Michael Filipovic* of *Seattle–King County Public Defender Association,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Joanne Y. Maida, Senior Deputy,* for respondent.

ROSELLINI, J.—Petitioner Leslie Mathe seeks review of his conviction on two counts of first degree robbery while armed with a deadly weapon and firearm. Petitioner alleges the convictions are based on evidence seized illegally during a search of his bedroom. The Court of Appeals held the search was valid because it was authorized by the consent of a third party—petitioner's landlord. We hold that the landlord did not have authority to consent to a search of petitioner's room. We conclude, however, that the in–court identifications were made independent of the violation of petitioner's Fourth Amendment and Const. art. 1, § 7 rights. Petitioner's convictions are therefore affirmed. *State v. Mathe,* 35 Wn. App. 572, 668 P.2d 599 (1983).

I

Petitioner's convictions arise from the following facts:

On September 25, 1981, a man walked into the Daniel-

son's Westwood Jewelers, displayed a gun and demanded jewelry from the store's owner. After removing a number of rings from the display case and setting them upon the counter, the owner fled the store and had a neighbor call the police. Meanwhile, the robber absconded with about 150 rings. Two witnesses saw the robber run from the store.

The second robbery occurred on November 27, 1981, at a pharmacy in Seattle. Ms. Mark, a clerk, was alone in the pharmacy when a man appeared at the locked door holding what appeared to be a prescription. After the clerk let the man in, the man pulled out what appeared to be a gun and demanded drugs. The clerk gave the robber Valium and Percodan. The robber placed these items in a cream–colored bag and left the pharmacy.

Several months later, a police informant notified the police that John Benlien and a man known as "Leslie" were involved in the robberies. Both Leslie and John Benlien were, according to the informant, occasional residents of a house in West Seattle owned by James Hartz. Leslie reportedly often stayed at the house.

On the morning of December 31, 1981, six police officers, without a search warrant, went to the Hartz house. They testified they intended to obtain the owner's consent for entry and a search. Upon arriving at the residence, four of the police officers approached the door, identified themselves and asked if John Benlien was there. Mr. Hartz said no. The police asked if they could come in and "talk", and inquired as to whether anyone else was there. Mr. Hartz allegedly replied, "Only my old lady." When asked where she was, Mr. Hartz reportedly responded, "In the back bedroom."

The police went directly to that area and, without requesting admittance, walked into the bedroom. Petitioner and his girl friend, Jill, lay upon a mattress on the floor. Six inches from the bed lay a loaded shotgun.

Upon discovering the couple, the officers ordered them into the living room and requested identification, which was provided. The police photographed petitioner, placed the

pictures in a photo montage, and took the montage to Ms. Mark, who identified petitioner as the culprit. Thereafter, petitioner was arrested. Two police officers remained at the house until a search warrant was obtained and then seized some clothing and the cream–colored bag.

Prior to trial, petitioner moved to suppress evidence obtained from the house and any identifications derived from the arrest. Testimony at this hearing established that petitioner and his girl friend rented his bedroom and another, for Jill's daughter, from Hartz. The two bedrooms were for the couple's exclusive use.

The motion to suppress was denied because the trial judge found the landlord, Mr. Hartz, had consented to the search.

At trial, the two robbery victims each described the robber and his gun. Ms. Mark described a weapon which was "black and brownish . . . [with] an ivory–color handle." Ms. Nagel described the gun used in the jewelry store robbery as having a long, bluish, metal barrel and a maroon handle. Other witnesses identified petitioner as the man seen running from the jewelry store.

At the close of the evidence, the defense moved to strike the deadly weapon and firearm allegations. They asserted the evidence was insufficient to establish the presence of a deadly weapon. This motion was denied.

The jury found petitioner guilty of two counts of robbery in the first degree. The jury also concluded petitioner was armed with a deadly weapon and firearm.

On appeal to the Court of Appeals, Division One affirmed petitioner's conviction. We granted review.

## II

Petitioner raises four issues for review. Petitioner alleges first that the Court of Appeals erred in concluding that the search of petitioner's bedroom did not violate his right of privacy under the Fourth Amendment and Const. art. 1, § 7.

Initially, we note that the State bears the burden of

establishing the validity of a warrantless search. *See State v. Cole,* 31 Wn. App. 501, 643 P.2d 675 (1982). Consent to a search establishes the validity of that search if the person giving consent has the authority to so consent. *See State v. Vidor,* 75 Wn.2d 607, 452 P.2d 961 (1969).

Here, petitioner initially challenged the factual issue of whether the landlord consented to any search; this issue was resolved against him. Consequently, we will address only the issue of whether the landlord's consent was valid against petitioner.

No one disputes the evidence that the bedroom in question was used exclusively by petitioner and his girl friend, that they paid rent for its use and that the landlord neither used nor had possessions in that room. The sole question then is whether Mr. Hartz's consent to the police was effective as to petitioner's bedroom. This issue is one of first impression, although our courts have resolved related questions. In *State v. Christian,* 95 Wn.2d 655, 628 P.2d 806 (1981), we recognized the rule that "a landlord may not consent to a search and seizure on behalf of a tenant where the tenant is in undisputed possession of the property . . ." *Christian,* at 659. In *Christian,* we held that a landlord may consent to a search of a tenant's apartment when the tenancy has expired, will not be renewed and the tenant has been notified that the landlord will be cleaning the apartment. Under these circumstances, a defendant assumes the risk that the landlord will exercise his right of joint control. *Christian* thus acknowledges that a landlord has a right of joint control over an apartment once the lease expires and the apartment is being vacated.

*Christian* also dealt with the related question of when a tenant could assert the protections of the Fourth Amendment. This standing issue was resolved against the tenant whose lease had expired and who had been notified that the landlord would resume possession on a certain date. The court concluded that, under these facts, the tenant does not have an actual expectation of privacy which society is prepared to recognize as reasonable. *Christian,* at 659. *Chris-*

*tian* then adopted the combined subjective/objective test for standing questions of *Katz v. United States,* 389 U.S. 347, 361, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967) (Harlan, J., concurring). In summary, *Christian* establishes two propositions. First, a *former* tenant may not have the reasonable expectation of privacy necessary to assert the protections of the Fourth Amendment. Second, a landlord's consent is sufficient to authorize the search of a former tenant's apartment when the lease has terminated, the landlord has notified the tenant of his intent to resume possession on a certain day and the search occurs after that date.

Equally important to resolution of this case, however, is an understanding of what *Christian* did not address. *Christian* did not address, for instance, the problems created when a landlord purports to consent to a search involving a *current* tenant's living space. Moreover, *Christian* did not resolve Fourth Amendment standing questions arising from such facts. Finally, it did not discuss the issue of what standard our state constitution requires regarding landlord consent questions.

Nonetheless, the Court of Appeals relied on *Christian* to resolve these issues, even though this case presented no standing, or expectation of privacy question. The undisputed finding of fact here establishes petitioner's right to assert the protections of the Fourth Amendment and Const. art. 1, § 7. An individual who pays rent and uses an area exclusively has a legally cognizable right of privacy in those premises, which is eminently reasonable. Having paid rent for the exclusive use of the room, which served as his home, he certainly is entitled to believe that the law protects his room from unreasonable searches.

The Court of Appeals discussion confused standing issues (like those contained in *Christian*) with issues of consent. This is evident below:

Mathe testified to a subjective expectation of privacy. Under the circumstances, his expectation of privacy was not objectively reasonable: the door was left open while he slept; it appears that Mathe, the woman, and Hartz

were mutual friends and acquaintances, and that Mathe had resided in Hartz's home for only 6 months on a more or less temporary nature. Mathe assumed the risk that Hartz would enter the bedroom or permit others to do so. The trial court's denial of Mathe's motion to suppress is affirmed.

*State v. Mathe,* 35 Wn. App. 572, 579–80, 668 P.2d 599 (1983).

██ This language not only misconstrues standing analysis, it also improperly applies the United States Supreme Court test for consent cases. *United States v. Matlock,* 415 U.S. 164, 171, 39 L. Ed. 2d 242, 94 S. Ct. 988 (1974) contains the current federal test for consent issues. In *Matlock,* the Court stated that the "consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *Matlock,* at 170. Common authority was described.

Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third–party consent . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is *reasonable to recognize that any of the co–inhabitants has the right to permit the inspection* in his own right and that *the others* have assumed the risk that one of their number might permit the common area to be searched.

(Citations omitted. Italics ours.) *Matlock,* at 171 n.7.

Although we have not expressly adopted the *Matlock* test, *Christian* did rely on it in part. We believe this rule best balances the interest of the police in conducting searches and our citizens' right to privacy in their homes. We will, therefore, adopt the common authority standard, described in *Matlock,* as the proper guide to determine test questions of consent issues under Const. art. 1, § 7.

In applying the common authority rule, two aspects are important. First, a consenting party must be able to permit the search in his own right. Second, it must be reasonable

to find that the defendant has assumed the risk that a co–occupant might permit a search.[1] In its discussion of consent, the Court of Appeals discussed only assumption of the risk. This is an improper application of the common authority rule. The Court of Appeals analysis ignores evidence that the landlord here had no right of control over petitioner's bedroom. His only rights concerning the premises were those incidental to a landlord–tenant relationship. The landlord–tenant relationship will not support an inference that a search is authorized, when the tenant is in exclusive possession of the property. *Christian,* at 659. This rule applies, equally, to apartments and more limited rental arrangements such as those found in motels, boarding-houses and room rentals. *See* Annot., *Admissibility of Evidence Discovered in Warrantless Search of Rental Property Authorized by Lessor of Such Property—State Cases,* 2 A.L.R.4th 1173, 1208 (1980).

Our conclusion makes it unnecessary to discuss the second prong of the common authority rule. One does not reach the assumption of the risk analysis unless the person consenting to the search has common authority over the area to be searched. *United States v. Matlock, supra.* Here, Hartz did not have such authority.[2] As neither tenant who had such authority consented to the search, we conclude the search was unauthorized.

We turn now to the suppression issue. Generally, evidence obtained through an illegal search must be sup-

---

[1]These two prongs are closely intertwined. If a person has joint control over an area, it may be proper to presume that the defendant reasonably assumes the risk that the joint control may be authorized to allow a search. Thus, when joint control is found, assumption of the risk usually follows. The reverse, however, is not true. Without the right to control or exercise joint possession of a given area, no assumption of the risk analysis can validate the search.

[2]The Court of Appeals incorrectly relied upon evidence that petitioner's door was open to establish the landlord's common authority over the bedroom. No rationale was offered for the Court of Appeals conclusion that the open door related to the landlord's authority. We find this fact to be irrelevant. A person may, for various reasons, leave the door to his home or apartment ajar, yet still expect visitors, police or friends to ask permission before crossing the threshold.

pressed. *See State v. White,* 97 Wn.2d 92, 640 P.2d 1061 (1982). In the present case, however, no physical evidence obtained from petitioner's bedroom was admitted at trial. Nonetheless, petitioner urges the trial judge should have suppressed the photographs of petitioner which were taken by the police after the search. *See Wong Sun v. United States,* 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *State v. White, supra* at 101. He also suggests that the in–court identifications must be suppressed.

This is an issue of first impression for us. A similar question, however, was presented in *United States v. Crews,* 445 U.S. 463, 63 L. Ed. 2d 537, 100 S. Ct. 1244 (1980). In *Crews,* the police seized the robbery suspect, detained him at police headquarters, photographed him and then released him. The resulting photographs were next shown to the robbery victim, who identified the suspect as the robber. The defendant was then taken into custody. At a court ordered lineup, the witness identified the defendant as the culprit. The initial seizure was subsequently found to be an illegal arrest without probable cause. The trial judge suppressed the photographic identifications and lineup but allowed in–court identification by the victim.

In an opinion written by Justice Brennan, the United States Supreme Court affirmed. It reasoned that a victim's in–court identification of an accused has three elements:

> First, the victim is present at trial to testify as to what transpired between her and the offender, and to identify the defendant as the culprit. Second, the victim possesses knowledge of and the ability to reconstruct the prior criminal occurrence and to identify the defendant from her observations of him at the time of the crime. And third, the defendant is also physically present in the courtroom, so that the victim can observe him and compare his appearance to that of the offender.

*Crews,* at 471. The Court concluded that none of the three elements were obtained through a violation of defendant's Fourth Amendment rights.

Applying the first factor, the Court noted that the victim's identity was known to the police prior to the illegal

seizure and thus could not have been the result of the illegal search. *Crews,* at 471–72. Similarly, the illegal arrest did not infect the victim's ability to give accurate identification testimony. The Court described the process:

> Based upon her observations at the time of the robbery, the victim constructed a mental image of her assailant. At trial, she retrieved this mnemonic representation, compared it to the figure of the defendant, and positively identified him as the robber. No part of this process was affected by respondent's illegal arrest.

(Footnote omitted.) *Crews,* at 472.

The Court warned that a different case might require a different result.

> This is not to say that the intervening photographic and lineup identifications—both of which are conceded to be suppressible fruits of the Fourth Amendment violation—could not under some circumstances affect the reliability of the in–court identification and render it inadmissible as well. Indeed, given the vagaries of human memory and the inherent suggestibility of many identification procedures, just the opposite may be true.

(Footnote omitted.) *Crews,* at 472–73.

Finally, the Court rejected, outright, the contention that the defendant's presence at trial could be an illegal fruit.

Justice Brennan, however, then went on to discuss and reserve for future decision the question of whether a defendant's face had some evidentiary value in and of itself. Five justices then disagreed with this portion of the opinion, resulting in a majority of the Court holding the issue to be foreclosed by *Ker v. Illinois,* 119 U.S. 436, 30 L. Ed. 421, 7 S. Ct. 225 (1886).

■ Despite the Court's disagreement on this last issue, we find the analysis of *Crews* persuasive. Where, as here, each witness was known to the police prior to the illegal search, it makes little sense to view the witnesses as a fruit of the search. Further, each witness made an in–court identification which was based on her initial view of petitioner. This, too, cannot be properly seen as a tainted "fruit," when each witness had ample opportunity to observe the

defendant. Ms. Mark's identification, for instance, was based on extended observations of the defendant. She saw him first when he came to the door of the store. She observed him while admitting him, while he asked for drugs, and while she showed him out. Also, Ms. Mark's observations of petitioner were not under duress. Until petitioner displayed his gun, Ms. Mark had no reason to fear him.

Likewise, the second conviction is supported by testimony of three witnesses, who each had sufficient time to develop independent mental impressions by which to identify petitioner. Ms. Nagel, like Ms. Mark, first observed petitioner in a nonstressful situation, because he approached her as if he were a customer. Likewise, the other witnesses were in a nonthreatening situation. One of these first noticed petitioner loitering in front of the jewelry store and next observed him running from the store some 5 minutes later.

Despite these clear identifications, petitioner would have us exclude the in-court identifications of the witness, thus thwarting his prosecution. Neither the Fourth Amendment nor our state constitution requires such a result. *See United States v. Crews, supra.*

The convictions are therefore affirmed.

WILLIAMS, C.J., UTTER, BRACHTENBACH, DOLLIVER, DORE, DIMMICK, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.

Reconsideration denied November 13, 1984.