[No. 7262-2-III. Division Three. May 28, 1987.]

THE STATE OF WASHINGTON, *Respondent*, v. RICHARD
STANLEY KOEPKE, *Appellant*.

*Richard Stanley Koepke,* pro se, *Jack Burchard,* and *Jeffrey C. Barker,* for appellant (appointed counsel for appeal).

*Gary A. Riesen, Prosecuting Attorney,* for respondent.

MUNSON, J.—Richard S. Koepke appeals his conviction for first degree felony murder contending the court erred in (1) entering the findings of fact and conclusions of law from a suppression hearing after the notice of appeal was filed; (2) admitting into evidence several items seized during an allegedly illegal search; (3) allowing improper closing argument by the prosecutor; and (4) computing his offender score at sentencing. He alleges additional assignments of error pro se.

Mr. Koepke had been living for 2 to 3 weeks with Silas Barkley, his friend and gambling acquaintance, in an apartment Mr. Barkley had been renting in Bridgeport, Washington. On the morning of March 8, 1985, Mr. Koepke arrived at the Keen Spot Tavern in Wenatchee, where he

participated in a card game. He had played cards there many times and was acquainted with the owner, employees, and patrons of the tavern. He played cards for about 2 hours and lost about $80. He left the game but remained in the tavern, telling several people he did not have any more money. He asked one person if he could borrow money and asked several people about borrowing a gun. Early in the afternoon, he left the tavern only to return, wearing a new brown cowboy hat and carrying a brown paper bag. Later, he showed someone he had obtained a gun, carrying it in his belt under his coat.

Late in the afternoon, Diane Libby arrived at the tavern, sat at the bar, and visited with the owner and several other acquaintances. Just prior to 5 p.m., Ms. Libby cashed a payroll check in the amount of $404.96. The bartender paid her in $20 bills, except for the small change. Mr. Koepke had a clear view of Ms. Libby and stared at her when she cashed the check. He walked over to the bar and sat down next to her. She was overheard to tell him she wanted $44 he owed her; he said he would pay her if she would give him a ride to his apartment because he had some money there. They left the tavern together sometime around 5:30 p.m.

About 6 p.m. Pete and Dorothy Milos were driving down the hill from the Mission Ridge ski area to Wenatchee when they noticed a vehicle had gone off the road and come to rest in the snow about 40 feet below the road. They stopped to investigate; Mr. Milos got out of the car, looked over the bank, and saw a man standing next to the wrecked car. He did not see any tracks in the snow coming up from the wrecked car. Mr. Milos asked the man if he was hurt; the man answered no. He asked if anyone else was in the car; the man again answered no. The man then walked up the bank and asked Mr. Milos for a ride to Wenatchee. Mr. and Mrs. Milos both identified a large brown cowboy hat as the hat the man was wearing. The Miloses gave the man a ride to Wenatchee.

Soon after the Miloses left, other people arrived at the

accident scene, went down the hill, and found Ms. Libby in the middle of the front seat apparently dead. They found one set of footprints leading from the wrecked car up to the road. She had been shot three times through the right arm and right side of the stomach, and one time through the right side of her head. The cause of death was a gunshot wound to the brain. The driver's door could not be opened because it was resting against a tree. The passenger door was jammed shut and the glass from the window of the passenger door was broken out. Her purse had been emptied and was found in the backseat of the car. On top of the purse was a black clutch purse containing loose change.

About 7 p.m., Joe Evans, an acquaintance of Mr. Koepke, met him at the CC Mini Mart in Wenatchee. He gave Mr. Koepke a ride to Chelan so that Mr. Koepke could catch a bus to Brewster. On the way to Chelan, Mr. Koepke told Mr. Evans he had stabbed a Mexican and killed him. Mr. Koepke also threw something out of the window and told Mr. Evans they were .22 caliber cartridges. When they reached Chelan, Mr. Koepke gave Mr. Evans $8; Mr. Evans observed Mr. Koepke was carrying $200 to $300 in $20 bills and wearing a brown cowboy hat. The following day Mr. Koepke went with Mr. Barkley to Spokane to gamble.

On March 10, sheriff's deputies went to Mr. Barkley's apartment, found no one home, and left. On Mr. Barkley's return from Spokane a neighbor told him sheriff's deputies were looking for him. Mr. Koepke had not returned with Mr. Barkley. Mr. Barkley went to the sheriff's department in Bridgeport, talked with Sergeant Daniel LaRoche, and told him he could search his apartment. Sergeant LaRoche and two other deputies accompanied him to his apartment. Mr. Koepke was not present. Mr. Barkley consented to a search of the entire apartment, including Mr. Koepke's room. Sergeant LaRoche could not recall whether the door to Mr. Koepke's room was open or closed, but Mr. Barkley believed it was closed. After briefly looking into the bedroom, Sergeant LaRoche decided to obtain a search warrant; he taped the door shut and left the apartment.

Around 5 p.m. the next day, Sergeant LaRoche applied for a search warrant by telephone. After a superior court judge issued the search warrant, Sergeant LaRoche and two other officers went back to Mr. Barkley's apartment, served him the warrant, and searched Mr. Koepke's room. They seized a blue denim jacket, a brown cowboy hat, another jacket, and a shirt.

On March 11, while in Missoula, Montana, Mr. Koepke called the Missoula police department 911 dispatch and stated he wanted to talk about a murder in Wenatchee, Washington. After being arrested, he made several unsolicited statements to the police including, "All I know is I woke up and she was dead." The police video–taped an interview with him which was played at trial. The police then took him to the hospital to be examined. There, he told an officer, "She was dead and her guts were hanging out." He was brought to court for an extradition appearance on March 12. He waived his extradition rights and stated at the hearing, "I'm being charged with first degree murder. I was present at the time it took place . . ." On the way back from the hearing, he stated to an officer that someone else had killed the victim.

At trial, a laboratory expert testified the cowboy hat was covered with pieces of glass which matched the broken window in Ms. Libby's car. Another expert testified the blood on the jacket was found to be the same blood type as Ms. Libby's. Mr. Koepke presented a brief defense, calling only five witnesses: (1) a custody officer who testified he had $8 on him when he was booked; (2) two fingerprint experts, one of whom said a palm print in the car was not that of Mr. Koepke; (3) an employee of the Bohemian Tavern testified Mr. Koepke played cards there on the evening of March 8 and bought $40 in chips with two $20 bills taken from his pocket; and (4) a neighbor of Mr. Barkley who recalled seeing an older man in a cowboy hat one evening in early March. Mr. Koepke did not testify. The jury found him guilty of first degree felony murder. He appeals.

■ Mr. Koepke first contends the trial court erred in entering the suppression hearing findings of fact and conclusions of law on September 11, 1985, after his notice of appeal had been filed. The court held a suppression hearing on March 16, concerning the admissibility of the items found in his room. The jury returned a guilty verdict on May 24, and the court sentenced him on July 1. The State presented its proposed findings of fact and conclusions of law regarding the suppression motion at the sentencing hearing on July 1; defense counsel submitted its proposed findings of fact and conclusions of law on August 19. The court entered the State's findings, plus three disputed findings by defense counsel, on September 11. Mr. Koepke cites CrR 3.6 for his contention. The purpose of the rule is to have a record made. *State v. Moore,* 61 Wn.2d 165, 175, 377 P.2d 456 (1963). This purpose was served here; Mr. Koepke has not shown any prejudice.

Mr. Koepke next contends the court erred by not suppressing the items seized during the search of Mr. Barkley's apartment because Mr. Barkley did not have the authority to consent to the search of his room. The State has the burden of establishing the validity of a warrantless search. *State v. Mathe,* 102 Wn.2d 537, 540–41, 688 P.2d 859 (1984). A person consenting to a warrantless search must have the authority to do so. *Mathe,* at 541. The issue is whether Mr. Barkley, a lessee of a 2–bedroom apartment, had the authority to consent to a search of a bedroom temporarily used by Mr. Koepke.

In *State v. Christian,* 95 Wn.2d 655, 628 P.2d 806 (1981), the court recognized the rule a landlord may not consent to a search of a tenant's apartment when the tenant is in sole possession of the property. The court then established two propositions:

First, a *former* tenant may not have the reasonable expectation of privacy necessary to assert the protections of the Fourth Amendment. Second, a landlord's consent is sufficient to authorize the search of a former tenant's apartment when the lease has terminated, the landlord

has notified the tenant of his intent to resume possession on a certain day and the search occurs after that date. *Mathe,* at 542 (summarizing *State v. Christian, supra).*

In *State v. Mathe, supra,* the defendant claimed his landlord had no right to consent to search a room of which he was in exclusive possession. The court adopted the common authority standard developed in *United States v. Matlock,* 415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988 (1974) to determine questions of consent under the Washington constitution.

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third–party consent . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is *reasonable to recognize that any of the co–inhabitants has the right to permit the inspection* in his own right and that *the others* have assumed the risk that one of their number might permit the common area to be searched.

*Mathe,* at 543 (quoting *Matlock,* 415 U.S. at 171 n.7). The court explained that in applying the standard, two things are important: (1) the consenting party must be able to permit a search in his own right, and (2) it must be reasonable to find the defendant assumed the risk a co–occupant might permit a search.

The court concluded the State failed to satisfy the first prong because the owner had no right of control over Mr. Mathe's bedroom; his only rights were incidental to a landlord–tenant relationship. The owner did not have the authority to consent to a search of a room in which Mr. Mathe had exclusive possession. *Mathe,* at 544. The court did not address the second prong. There are two important facts concerning Mr. Mathe's possession of the room which distinguish that case from the present case: Mr. Mathe paid rent and the owner neither used nor had possessions in the room. *Mathe,* at 541.

In the present case, it is clear Mr. Barkley and Mr. Koepke are engaged in a host–guest relationship, rather

than a landlord–tenant relationship. Mr. Koepke's stay at Mr. Barkley's apartment was only meant to be temporary; Mr. Koepke paid no rent; he had been there only 2 or 3 weeks and Mr. Barkley was planning on asking him to leave in the near future.

Because a host has a right of control over a guest's bedroom, the first prong of the common authority test is met. Courts, wary of the language in *Matlock,* 415 U.S. at 171 n.7, that consent is "not to be implied from the mere property interest a third party has in the property", closely examine the particular host–guest relationship to determine whether the guest assumed the risk the host may permit the search. *See* 3 W. LaFave, *Search and Seizure* § 8.5(d) (2d ed. 1987).

Mr. Koepke contends he did not assume the risk Mr. Barkley would allow the police to search his room because (1) he kept the door closed, (2) Mr. Barkley did not need ready access to the gambling equipment stored in the room, and (3) Mr. Barkley testified he did not feel he had the right to "trespass" into the room. He also contends he is entitled to a further degree of privacy in a closet of the room where the police found his cowboy hat.

We find Mr. Koepke did not have a reasonable expectation of privacy in Mr. Barkley's apartment for the following reasons: (1) he did not pay rent, (2) he had only stayed there for 2 or 3 weeks and Mr. Barkley planned on asking him to leave, (3) there was no lock on the door, (4) Mr. Barkley stored gambling equipment in the room, and (5) there was no indication when Mr. Koepke would return. Although Mr. Barkley stated he did not feel he could "trespass" in Mr. Koepke's room, he said he did not feel he had to get Mr. Koepke's permission to take some of his equipment out. Mr. Koepke assumed the risk Mr. Barkley might permit the police to search his room.

In the alternative, Mr. Koepke asserts the trial court erred in determining Mr. Barkley's consent to the search on March 10 extended to the second search conducted the following day. As previously noted after hearing from a neigh-

bor, Mr. Barkley went to the sheriff's office in Bridgeport and ultimately told the deputies they could search his apartment. At the apartment, Mr. Barkley again consented to a search of the entire apartment. After looking into Mr. Koepke's room, Sergeant LaRoche said he wanted to get a search warrant to "make this legal." He came back sometime after 5 p.m. on March 11 and searched Mr. Koepke's room, seizing several items.

It is clear from the testimony at the suppression hearing Mr. Barkley did not expressly consent to the second search on March 11. The trial court concluded the search warrant obtained by Sergeant LaRoche on March 11 was unnecessary because Mr. Barkley clearly consented to the search at the sheriff's office and when the deputies arrived at the apartment on March 10. The court apparently ruled the initial consent extended to the second search conducted the next day.

Mr. Koepke contends the consent obtained by Sergeant LaRoche to conduct the first search did not continue to validate the second search. Second or repetitive searches and seizures are unreasonable. *See, e.g., Little v. Rhay,* 68 Wn.2d 353, 359, 413 P.2d 15, *appeal dismissed, cert. denied,* 385 U.S. 96 (1966); *McNear v. Rhay,* 65 Wn.2d 530, 540, 398 P.2d 732 (1965); *State v. Jones,* 22 Wn. App. 447, 451, 591 P.2d 796 (1979); *State v. Gallo,* 20 Wn. App. 717, 725, 582 P.2d 558, *review denied,* 91 Wn.2d 1008 (1978).

■ None of the "second search" cases are factually similar to the present case. For example, in the only one of the above cases in which the court found an improper "second search," the first search was conducted by officers looking for stolen property, while the second search was conducted by a different set of officers looking for narcotics. *McNear v. Rhay, supra.* In *State v. Gallo, supra,* the court explained that whether a second search is a continuation of the initial search depends upon the facts of each case. The court listed three factors to be considered: "(1) whether the reentry search was conducted by the same officers; (2) whether the reentry had the same objective as the initial

search; and (3) whether the time interval between the searches suggests an abandonment or completion of the initial search." *Gallo,* at 725.

Here, the search on March 11 was conducted by the same officers seeking the same items, namely, evidence which would indicate Mr. Koepke was involved in the murder of Ms. Libby. Although the time interval was 24 hours, Sergeant LaRoche told Mr. Barkley he would get a search warrant and then came back to complete the search. There was no suggestion the initial search on March 10 was abandoned or completed.

Mr. Koepke's argument that the second search required a second separate consent by Mr. Barkley is overly technical and ignores a commonsense view of the entire picture. The first search was valid; Mr. Barkley had the authority and clearly consented to a search of the entire apartment. Had Sergeant LaRoche continued the search, gone into Mr. Koepke's room, and seized the incriminating evidence, this court would have found a valid search. However, Sergeant LaRoche, as a precautionary measure, declined to search this room, left the apartment, and obtained a search warrant. When he returned the next day, Mr. Barkley gave no indication he had withdrawn his consent. Mr. Koepke correctly asserts it is the State's burden to prove the validity of a warrantless search, *Mathe,* at 541, and that consent was freely and voluntarily given. *State v. Counts,* 99 Wn.2d 54, 64, 659 P.2d 1087 (1983). However, under these facts, where the State has proven Mr. Barkley consented to the search of March 10, the State does not have to prove a separate consent on March 11. Sergeant LaRoche ceased a valid search as a precautionary measure and obtained a search warrant. This decision should not place the officers in any less favorable a position.[1]

---

[1] Mr. Koepke contends that if there was no consent to the second search, the search warrant was not valid. Sergeant LaRoche applied for a telephonic search warrant just after 5 p.m. on March 11. Sergeant LaRoche, under oath, read to the judge the search warrant affidavit he had prepared that day. The affidavit states that a crime has been committed, but it does not contain any facts which link Mr.

 Nonetheless, the court's decision to refuse to suppress the evidence was harmless error; we are convinced beyond a reasonable doubt that any reasonable jury would have reached the same result had the error not occurred. *State v. Guloy,* 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020, 89 L. Ed. 2d 321, 106 S. Ct. 1208 (1986). The court must apply the "overwhelming untainted evidence" test to determine if the evidence is "so overwhelming that it necessarily leads to a finding of guilt." *Guloy,* at 426. This determination is made upon review of the entire record. *State v. Hieb,* 107 Wn.2d 97, 110, 727 P.2d 239 (1986).

Here, the untainted evidence of guilt is overwhelming given (1) Mr. Koepke lost money playing cards and asked several people in the tavern if he could borrow money or a gun; (2) he was later seen carrying a gun; (3) he watched the victim receive a little over $400 in $20 bills; (4) he asked the victim to give him a ride to his apartment, although, in fact, his apartment was not close by; (5) a person of similar description was given a ride to town from the accident scene; (6) Ms. Libby was found dead in her car a short time later; she had been shot at close range four times; (7) her purse had been emptied; (8) later that evening, an acquaintance of Mr. Koepke gave him a ride to Chelan; Mr. Koepke threw .22 caliber cartridges out of the window; (9) after arriving in Chelan, the acquaintance noticed Mr. Koepke was carrying a wad of $20 bills; (10) 3 days later, Mr. Koepke called the Missoula police and said he wanted to talk about a murder in Wenatchee; (11) he later stated to the police, "All I know is I woke up and she

---

Koepke to the crime other than the statement: "Through investigation, Detective Bill Patterson[,] Chelan County Sheriff's Depart.[,] learned that there was probable cause to arrest Richard S. Koepke, for the murder of Dianne Libbey [*sic*]." Mere conclusory statements in an affidavit cannot alone establish probable cause. *State v. Trasvina,* 16 Wn. App. 519, 524, 557 P.2d 368 (1976), *review denied,* 88 Wn.2d 1017 (1977). The affidavit contains no facts to support this statement of probable cause. We now know the deputy had the necessary facts, he just did not include them. Nonetheless, the affidavit would not lead a reasonable person to conclude the defendant was probably involved in criminal activity.

was dead."; and finally (12) he later stated he was there when the murder occurred. The error, if any, was harmless given this overwhelming evidence of Mr. Koepke's guilt.

Mr. Koepke next contends the trial court erred in allowing improper closing argument. He directs the court's attention to two statements made by the prosecutor during his closing rebuttal argument. He did not object to either of these statements at trial. If a defendant fails to make an adequate timely objection and request for a curative instruction, the objection is waived unless the prosecutor's argument is flagrant and ill intentioned and the resulting prejudice is so enduring no corrective instruction could have cured it. *State v. Charlton,* 90 Wn.2d 657, 661, 585 P.2d 142 (1978).

First, the prosecutor stated that a person charged with first degree murder who did not do it, but knew who did, would definitely tell someone. Mr. Koepke contends this statement is improper because it is a comment on the fact he exercised his right to be silent at trial. It is improper for the prosecutor to comment to the jury on the failure of a defendant to testify in a criminal case. *Charlton,* at 663. The State contends the prosecutor's comment was a response to defense counsel's statement in his closing argument that someone else had murdered Ms. Libby. In addition, *defense counsel,* during closing argument, brought up the fact Mr. Koepke did not take the stand.

Mr. Koepke also contends the prosecutor's statement he represented Ms. Libby was improper. Appeal to a jury's passion or prejudice is improper. *State v. Belgarde,* 46 Wn. App. 441, 448, 730 P.2d 746 (1986). Although improper, neither of these statements is so flagrant and ill intentioned that corrective instructions would not have cured any prejudicial effect. Moreover, in light of the overwhelming evidence of guilt in this case, they are harmless error. Thus, there is not a substantial likelihood it affected the jury's verdict. *See State v. Mak,* 105 Wn.2d 692, 726, 718 P.2d 407 (1986).

Mr. Koepke next contends the trial court erred in deter-

mining Mr. Koepke had a total offender score of 4. The sentencing court found Mr. Koepke had been convicted of second degree burglary on four previous occasions: (1) in 1967 in the state of Washington, (2) in 1975 in the state of Georgia, (3) in 1977 also in the state of Georgia, and (4) in 1982 in the state of Washington. The last conviction included a conviction for second degree theft. The court determined the proper offender score was 4. The seriousness level for the crime of first degree murder is 13. The standard sentencing range was 281 to 374 months; the court imposed a sentence of 374 months.

Mr. Koepke first contends the two Georgia convictions should not be used to calculate the offender score because the State did not prove he was the same person who committed the crimes in Georgia. However, he did not state at the sentencing hearing he was not the person named in the prior convictions; thus, he cannot now complain the State did not meet its burden of proof. *State v. Ammons*, 105 Wn.2d 175, 190–91, 713 P.2d 719, 718 P.2d 796 (1986).

Mr. Koepke also contends the two Georgia convictions should have only counted as 1 point because it is unclear whether the two burglaries encompassed the same criminal conduct or whether the two sentences were served concurrently or consecutively. *See* former RCW 9.94A.360(11), Laws of 1984, ch. 209, § 19, p. 1069 and former RCW 9.94A.400(1)(a), Laws of 1984, ch. 209, § 25, p. 1074. Specifically, Mr. Koepke points out the indictments for the two burglaries contain the same list of witnesses, the indictments indicate the burglaries were committed on the same day, the two cases have consecutive numbers, the jury's verdicts of guilt are both dated February 18, 1975, and the signatures of the jury foreman are identical. However, the indictments indicate the burglaries involved two different residences. They could have been committed hours apart. Curiously, the sentence on the first conviction is signed February 19, 1975, while the sentence on the second conviction was not signed until November 7, 1977. Mr. Koepke

offered no other evidence at sentencing.

The State has the burden of proving a prior conviction by a preponderance of the evidence. RCW 9.94A.110; *Ammons,* at 185–86. What little evidence there is on this record indicates the two burglaries involved two separate residences, thus did not encompass the same criminal conduct. *See State v. King,* 47 Wn. App. 38, 40, 733 P.2d 568 (1987); *State v. Calloway,* 42 Wn. App. 420, 711 P.2d 382 (1985); *State v. Adcock,* 36 Wn. App. 699, 676 P.2d 1040, *review denied,* 101 Wn.2d 1018 (1984). Also, it does not appear the two convictions were served concurrently, given that the second conviction was signed 2 years 8½ months after the first. On this record, the trial court correctly treated the Georgia convictions separately in computing Mr. Koepke's offender score.

Mr. Koepke raises several assignments of error pro se. He first contends the trial court erred in refusing to change the venue. He did not move the trial court to change the venue. This error cannot be raised for the first time on appeal. RAP 2.5(a); *State v. Smith,* 104 Wn.2d 497, 508, 707 P.2d 1306 (1985).

He next contends the trial court erred in admitting into evidence the items found in his room. This argument is answered in the opinion.

Next, he contends the trial court erred when it proceeded with trial after the filing of an invalid information. Although he was charged with both first degree felony murder and first degree robbery, the court instructed the jury only as to the charge of first degree felony murder. The jury found him guilty of only first degree felony murder. It is a denial of equal protection if the prosecutor has discretion to seek varying degrees of punishment by proof of identical criminal elements. *State v. Cann,* 92 Wn.2d 193, 196, 595 P.2d 912 (1979). The crimes of first degree felony murder and first degree robbery do not have identical elements. Presumably, the prosecutor felt there was sufficient evidence he murdered Ms. Libby in the course of a robbery

to instruct the jury only on the charge of first degree felony murder. There was no denial of equal protection.

Mr. Koepke next contends the trial court erred in refusing to instruct the jury he may have had an accomplice. We cannot find any objection made to the trial court; thus, it is not a proper assignment of error. RAP 2.5(a); *Smith*, at 508.

Last, he contends the trial court erred in admitting the 911 tape. He contends the admission of the 911 tape violated his Fifth and Fourteenth Amendment rights and his right to confront witnesses. However, at trial, his counsel objected to the introduction of the 911 tape only on the basis of a lack of foundation. A party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial. *Guloy,* at 422.

However, because the alleged error may have affected a constitutional right, Mr. Koepke may raise it for the first time on appeal. *Hieb,* at 108. He relies primarily on *State v. Ross,* 42 Wn. App. 806, 714 P.2d 703 (1986). There, the court held that a 911 tape was admissible as a business record, and the statements on the tape came within the excited utterance exception to the hearsay rule. *Ross,* at 809. Here he identified himself and stated he wanted to talk about a murder in Wenatchee; these statements are his own, thus, are not hearsay. ER 801(d)(2).

Though admissible under the rules of evidence, the statements must not violate the Sixth Amendment confrontation clause. *Guloy,* at 424. However, the confrontation clause is not applicable where the defendant is complaining about his own statement. It is more properly framed as a possible violation of Mr. Koepke's Fifth Amendment right against self–incrimination. However, there is no allegation he was coerced into making the statement to the police; the evidence suggests it was nothing but a purely voluntary act on the part of Mr. Koepke. Therefore, his constitutional rights were not violated.

The conviction is affirmed.

McINTURFF, C.J., and GREEN, J., concur.