IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 79346-2-I |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| ALBERTO L. DIAZ-BARRIENTOS, | |
| Appellant. | |

BOWMAN, J. — Alberto L. Diaz-Barrientos appeals his jury conviction for domestic violence felony violation of a no-contact order. He argues the trial court erred when it denied his motion to suppress all evidence obtained during a warrantless search of his home. He contends the court admitted police body-camera recordings in violation of the Washington privacy act (WPA), chapter 9.73 RCW. He also argues the court erred in denying his motions for mistrial based on the victim's alleged improper trial testimony. Finally, he claims cumulative error deprived him of his right to a fair trial. We affirm.

FACTS

On January 16, 2018, Seattle Municipal Court issued a domestic violence no-contact order prohibiting Diaz-Barrientos from having any contact with V.N. for five years. The order prohibited Diaz-Barrientos from assaulting, "directly" or

"indirectly" contacting, and coming within 500 feet of V.N. Diaz-Barrientos signed and acknowledged receipt of a copy of the no-contact order.

At approximately 8:00 p.m. on April 13, 2018, V.N. called 911 to report that she "got beat up really bad" by her ex-boyfriend, with whom she had a no-contact order, and that she was about to "have a seizure." V.N. told the 911 operator that her ex-boyfriend was looking for her and that she was hiding under a car. Seattle Police Officer Brandon McDougald and Officer William Kohn responded to the scene. Both officers were equipped with body cameras that captured "a chest level view of everything" the officers saw and heard.

Officer McDougald's body camera captured a shivering V.N. who was wearing nothing but a long T-shirt. To Officer McDougald, V.N. "seemed disoriented" and he could tell that she had "some major injuries on her face." He saw that "her lip was swelling and bleeding, and . . . her left eye was swelling and badly bruised." V.N. told Officer McDougald that her ex-boyfriend Diaz-Barrientos assaulted her and then "pointed down towards the apartment complex" where Diaz-Barrientos lived. She said that she escaped by jumping off the apartment balcony and hiding under a car.

Officer McDougald confirmed the no-contact order and went to the apartment address listed in the order to search for Diaz-Barrientos. The apartment was 300 to 400 feet away from where the officers found V.N. At the apartment, a man who identified himself as "Diaz-Barrientos' father" answered the door. The man had difficulty communicating in English. Officer McDougald did not verify that the man was actually Diaz-Barrientos' father. Officer

2

McDougald asked the man if police "could check the residence for his son and he agreed." Officer McDougald did not confirm Diaz-Barrientos' father had the authority to give consent to search the apartment or tell him that he could refuse the search.

The police walked through the residence. Officer McDougald observed the living area was in "disarray," with the bed "all torn apart" and knocked over items. The officers did not locate Diaz-Barrientos in the apartment or surrounding area.

Two days later on April 15, Officer Michael Fabbricante responded to an anonymous 911 call and found Diaz-Barrientos at the apartment. He confirmed Diaz-Barrientos' identity by looking at his driver's license. Police officers searched the apartment again.

The State charged Diaz-Barrientos by amended information with one count of domestic violence felony violation of a no-contact order "between April 12, 2018 and April 13, 2018." He pleaded not guilty.

During pretrial motions, Diaz-Barrientos moved to suppress the officers' body-camera recordings and to suppress all evidence obtained in an unlawful search of his apartment on April 13.[1] The court denied Diaz-Barrientos' motion to suppress the evidence obtained during the April 13 warrantless search of his apartment as well as his request to suppress the body-camera recordings.[2] However, the court granted Diaz-Barrientos' ER 404(b) motion in limine to

_____

[1] Diaz-Barrientos also moved to suppress all evidence obtained in the April 15, 2018 search of his apartment. The court did not admit this evidence at trial.

[2] The court ordered the State to redact portions of the body-camera recordings for trial to comply with hearsay requirements.

exclude any evidence concerning his criminal history unless it became relevant for impeachment purposes.

Several witnesses testified during the two-day jury trial.  Officer Kohn testified that on April 13, 2018, he responded to V.N.'s 911 call reporting domestic violence assault.  Officer Kohn testified that he wore a body camera during the investigation and the State played portions of the video for the jury.  Officer McDougald authenticated the portion of his body-camera recording that the State played for the jury and described V.N.'s injuries when he found her on April 13.  Officer McDougald testified about investigating Diaz-Barrientos' address and searching his apartment.

Detective Melody Rios authenticated the January 16, 2018 Seattle Municipal Court domestic violence no-contact order, V.N.'s 911 call, and Diaz-Barrientos' driving record and driver's license.  Officer Fabbricante testified that he "c[a]me into contact with" Diaz-Barrientos at his apartment on April 15, 2018 and viewed Diaz-Barrientos' government-issued photo identification.[3]

Dr. Bjorn Watsjold, an emergency physician at Harborview Medical Center, testified about his treatment of V.N.'s injuries on April 13, 2018.  He said that V.N. told medical personnel "that she had been hit" in the face and abdomen with "fists" and "a stick," that "she had been choked, and that at some point she had fled from an assailant and jumped out a window."  She identified the person that assaulted her as her "partner or an ex-partner."  Some of her injuries,

---

[3] Officer Fabbricante did not testify that he was responding to a 911 call on April 15 or that officers searched Diaz-Barrientos' apartment that day.

4

including "bruises and the injuries to the shins, the knees," were "consistent with having fallen from . . . a height or landing on things on the way down."

During her trial testimony, V.N. described her history with Diaz-Barrientos, what happened on the night of April 13, and that despite the no-contact order, she was trying to give him a second chance to have a relationship. Diaz-Barrientos twice moved for a mistrial, claiming that V.N.'s testimony violated the pretrial ruling precluding comment on Diaz-Barrientos' criminal history. The court denied both motions but gave a curative instruction after the second motion to strike and disregard V.N.'s improper testimony.

Diaz-Barrientos did not testify at trial and the defense rested without calling any witnesses. In closing, Diaz-Barrientos argued that V.N.'s "story doesn't make sense" and that the State did not present any evidence that Diaz-Barrientos and V.N. were together in his apartment on April 13, 2018.

A jury convicted Diaz-Barrientos as charged of felony violation of a no-contact order. By special verdict, the jury found the crime was an aggravated domestic violence offense. The trial court imposed a 20-month standard-range sentence. Diaz-Barrientos appeals.

ANALYSIS

The WPA

Diaz-Barrientos argues the court's admission of the police body-camera recordings depicting police interaction with V.N. violated the WPA because the officers failed to advise V.N. that she was being audio recorded as required by

5

RCW 9.73.090(1)(c).[4]  We disagree.

The WPA makes it "unlawful" for any person to intercept or record a private communication "without first obtaining the consent of all the persons engaged in the conversation."  RCW 9.73.030(1).  "Any information obtained in violation of RCW 9.73.030 . . . shall be inadmissible in any civil or criminal case in all courts of general or limited jurisdiction in this state."  RCW 9.73.050.

Here, Diaz-Barrientos claims that all police recordings must "strictly conform" to the requirements in RCW 9.73.090(1)(c).  However, the plain language of RCW 9.73.090(1)(c) does not apply to situations involving police body-camera recordings:

> Sound recordings that correspond to video images recorded by video cameras mounted in law enforcement vehicles.  All law enforcement officers wearing a sound recording device that makes recordings corresponding to videos recorded by video cameras mounted in law enforcement vehicles must be in uniform.  A sound recording device that makes a recording pursuant to this subsection (1)(c) must be operated simultaneously with the video camera when the operating system has been activated for an event.  No sound recording device may be intentionally turned off by the law enforcement officer during the recording of an event.  Once the event has been captured, the officer may turn off the audio recording and place the system back into "pre-event" mode.
> . . . .
> A law enforcement officer shall inform any person being recorded by sound under this subsection (1)(c) that a sound recording is being made and the statement so informing the person shall be included in the sound recording, except that the law enforcement officer is not required to inform the person being recorded if the person is being recorded under exigent circumstances.  A law enforcement officer is not required to inform a person being recorded by video under this subsection (1)(c) that the person is being recorded by video.

---

[4] Even though Diaz-Barrientos was not a participant in any of the body-camera recordings, he still "has standing to object to use of evidence obtained in violation of the [WPA]." State v. Williams, 94 Wn.2d 531, 534, 545-46, 617 P.2d 1012 (1980).

Diaz-Barrientos asks us to interpret the plain language of the statute to include application to body-camera recordings. But unambiguous statutory language is not subject to interpretation; the meaning is derived entirely from the subject matter and context. State v. Sunich, 76 Wn. App. 202, 206, 884 P.2d 1 (1994). We may not read unwritten language into a statute. State v. Malone, 106 Wn.2d 607, 610, 724 P.2d 364 (1986). We construe statutes to avoid rendering any word or provision meaningless. State v. Contreras, 124 Wn.2d 741, 747, 880 P.2d 1000 (1994). Privacy protections under the WPA are statutory in nature. Expansion of those protections must come from the legislature.

In State v. Clayton, 11 Wn. App. 2d 172, 452 P.3d 548 (2019), review denied, No. 97991-0 (Wash. July 10, 2020), 2020 WL 3888316, Division Three of our court reached the same conclusion. There, multiple police officers responded to investigate a report of shots fired. Clayton, 11 Wn. App. 2d at 174. "Three officers had active body cameras recording the investigation, but none of the residents were advised of that fact." Clayton, 11 Wn. App. 2d at 174.[5] The trial court denied Clayton's motion to suppress, ruling that "the investigation did not involve a private conversation." Clayton, 11 Wn. App. 2d at 174-75, 177. Affirming the trial court's decision, Division Three concluded, "The [WPA] does not address police body cameras. It is up to the legislature to extend the protections of the act to the use of those cameras if it so desires." Clayton, 11 Wn. App. 2d at 180.

---

[5] Emphasis added.

The trial court did not violate the WPA in admitting the police body-camera recordings.

Unlawful Search

Diaz-Barrientos also argues that the trial court erred when it denied his motion to suppress evidence the officers obtained during a warrantless search of his apartment on April 13, 2018.[6] The State concedes that "the officers' entry was improper and their observations inside the apartment should have been suppressed."

Warrantless searches are per se unreasonable under article I, section 7 of our state constitution[7] unless they fall within an established and well-delineated exception to the warrant requirement. State v. Ross, 141 Wn.2d 304, 312, 4 P.3d 130 (2000). Consent to search by a person that is authorized to do so is one such exception our courts recognize. State v. Mathe, 102 Wn.2d 537, 541, 688 P.2d 859 (1984).

> To obtain valid consent, police must "inform the person from whom consent is sought that he or she may lawfully refuse to consent to the search and that they can revoke, at any time, the consent that they give, and can limit the scope of the consent to certain areas of the home."

Mayfield, 192 Wn.2d at 877 n.1 (quoting State v. Ferrier, 136 Wn.2d 103, 118, 960 P.2d 927 (1998)). Accordingly, if "the police choose to conduct a search without a search warrant based upon the consent of someone they believe to be

---

[6] Diaz-Barrientos does not challenge evidence obtained during the April 15, 2018 search of his apartment because that evidence was not introduced at trial.

[7] Article I, section 7 provides broader protection than the Fourth Amendment to the United States Constitution. State v. Mayfield, 192 Wn.2d 871, 878, 434 P.3d 58 (2019).

authorized to so consent, the burden of proof on issues of consent . . . is on the police." State v. Morse, 156 Wn.2d 1, 15, 123 P.3d 832 (2005).

Because the evidence supports the State's acknowledgment that the officers did not "establish that [Diaz-Barrientos' father] had the authority to consent" to a search of the apartment or "inform [him] that he could refuse consent," we accept the State's concession of error. And because evidence obtained directly or indirectly from an unlawful search or seizure must be suppressed under the fruit of the poisonous tree doctrine, the court erred in denying Diaz-Barrientos' motion to suppress that evidence. Mayfield, 192 Wn.2d at 888-89.

Constitutional error is presumed prejudicial, but we apply a harmless error analysis when the trial court admits evidence that is the product of a warrantless search. State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). A constitutional error is harmless if we are "persuaded beyond a reasonable doubt that the jury would have reached the same result in absence of the error." State v. Fisher, 185 Wn.2d 836, 847, 374 P.3d 1185 (2016). In determining whether constitutional error is harmless, we consider "whether the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt." Fisher, 185 Wn.2d at 847.

Here, the overwhelming untainted evidence supports the jury finding Diaz-Barrientos guilty of felony violation of the no-contact order. To convict Diaz-Barrientos of felony violation of a no-contact order, the State must prove beyond

9

a reasonable doubt:

> (1)  That between April 12, 2018 and April 13, 2018, there existed a no-contact order applicable to the defendant;
> (2)  That the defendant knew of the existence of this order;
> (3)  That on or about said date, the defendant knowingly violated a provision of this order;
> (4)  That:
>> (a)  The defendant's conduct was an assault or
>> (b)  The defendant's conduct was reckless and created a substantial risk of serious physical injury to another person; and
>
> (5)  That the defendant's act occurred in the State of Washington.[8]

At trial, defense counsel told the jury, "It's not going to be a question whether [V.N.] was assaulted" and, "You're going to see evidence of a no-contact order."  Diaz-Barrientos narrowed his defense to the sole issue of whether he was at the apartment with V.N. on the night of April 13, and defense counsel argued the evidence "doesn't put him and her together that night."

The court admitted as exhibits a certified copy of the January 2018 domestic violence no-contact order as well as the recording of the 911 call V.N. made requesting help on April 13.  The State played the recording of the 911 call for the jury.  The 911 call established that V.N. told the operator that she "got beat up really bad" by "[m]y ex-boyfriend."

The court admitted as an exhibit and the State played for the jury the recording of Officer Kohn's body camera.  The recording established that V.N. identified Diaz-Barrientos as the "boyfriend" that hit her on April 13:

> [OFFICER KOHN]:    So what's your boyfriend's name?
> [V.N.]:    His name is —

---

[8] To determine whether this violation constituted a "domestic violence" offence, a special verdict form asked the jury, "Were Alberto L[.] Diaz-Barrientos and [V.N.] members of the same family or household prior to or at the time the crime was committed."

[OFFICER KOHN]:     Can you spell his last name?
[V.N.]:     — Alberto.  Alberto.
[OFFICER KOHN]:     Spell his last name for me.
[V.N.]:     A — A-l-b-e-r-t-o.
[OFFICER KOHN]:     And first name?
[V.N.]:     Diaz.
[OFFICER KOHN]:     Spell it for me.
[V.N.]:     That's all I know.  Alberto Diaz.  Alberto Leonardo Diaz.

The court also admitted a copy of Diaz-Barrientos' driver's license, which corroborated V.N.'s testimony that she fled from a nearby apartment where her ex-boyfriend—the assailant—lived.  Diaz-Barrientos' driver's license showed his address was in the direction that V.N. pointed and only 300 to 400 feet away from where the responding officers first contacted V.N..

When she testified, V.N. described how Diaz-Barrientos became enraged by jealousy after "looking through my phone" and seeing phone numbers for male friends and family members.  V.N. testified that he proceeded to "attack" her "for no reason . . . physically and mentally and verbally."  V.N. told the jury how Diaz-Barrientos hit her "multiple times" in the face with "his fists," "choked" her "with a sheet," "kicked" and "dragged" her by her hands, and threw "stuff" at her.  V.N. testified that she told Diaz-Barrientos to stop several times "but he refused to" and seemed to "enjoy[ ] hitting me, just like it's fun."  And she described how she tried to leave but Diaz-Barrientos "didn't want me to," so she escaped by "jump[ing] off the balcony" wearing only "a regular shirt, with nothing on the bottom," and hiding under a car.  V.N. testified that she "remember[ed] exactly" that Diaz-Barrientos was the person who assaulted her on the night of April 13, 2018.

11

Additionally, Dr. Watsjold testified that while treating her at Harborview Medical Center for the injuries she suffered on April 13, V.N. reported her "ex-partner" assaulted her. And his physical examination of V.N. corroborated her testimony that she jumped off a balcony to escape Diaz-Barrientos:

> A.    For us, [the ambulance record showed] only that she had jumped out of a window running from an assailant. I didn't get a lot of detail as far as why she jumped out or how she landed or other things that might be relevant.
> Q.    Did you observe any injuries that supported that?
> A.    The bruises and the injuries to the shins, the knees, the inside of the upper arms, would all potentially be consistent with having fallen from a fight — a height or landing on things on the way down.

Finally, Officer Fabbricante testified that on April 15, 2018, he contacted Diaz-Barrientos at the apartment listed on Diaz-Barrientos' driver's license and that Diaz-Barrientos "told me he loved" V.N.

We conclude beyond a reasonable doubt that because the overwhelming untainted evidence supports the jury finding that Diaz-Barrientos assaulted V.N. on April 13 and that his contact with her violated a valid no-contact order, any error related to Officer McDougald's description of the interior of Diaz-Barrientos' apartment was harmless.

<u>Motions for Mistrial</u>

Diaz-Barrientos argues that the trial court erred in denying his motions for a mistrial. We review a court's denial of a motion for mistrial for abuse of discretion. <u>State v. Greiff</u>, 141 Wn.2d 910, 921, 10 P.3d 390 (2000). A court abuses its discretion when its decision is manifestly unreasonable, based on

untenable grounds, or made for untenable reasons. State v. Barry, 184 Wn. App. 790, 797, 339 P.3d 200 (2014).

"The trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012) (citing State v. Hopson, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989)). We will reverse a decision denying a mistrial only if there is a substantial likelihood the irregularity prompting the motion affected the jury's verdict. State v. Rodriguez, 146 Wn.2d 260, 269-70, 45 P.3d 541 (2002). In making that determination, a court considers (1) the seriousness of the irregularity, (2) whether the improper statement was cumulative of other evidence properly admitted at trial, and (3) whether an instruction to disregard the statement could have cured the irregularity. State v. Escalona, 49 Wn. App. 251, 254, 742 P.2d 190 (1987) (citing State v. Weber, 99 Wn.2d 158, 165-66, 659 P.2d 1102 (1983)).

I. First Motion

On direct examination, the prosecutor questioned V.N. about the April 13 assault and inquired about the location of Diaz-Barrientos' apartment:

> Q.   Okay.  You said you were celebrating [Cambodian New Year] with him.
> A.   Yes, instead of being with my family.
> Q.   And when you say him, do you mean Alberto?
> A.   Yes.
> Q.   And where were you with him?
> A.   I was at his house.
> Q.   And do you remember where that is located?  Do you remember the street?
> A.   I remember that we were spending time together.  It was — it was so romantic and everything, and so I just started falling asleep and everything just happened, just happened out of

the blue. Like, it's hard to remember, because I — I try not to, but it just happened so fast.

Q.      And I know this is really hard.

A.      I gave him a chance <u>when he got out</u>.

Q.      I'm just going to stop you for just a second, okay?

[DEFENSE COUNSEL]:     I'm going to object, Your Honor.

Q.      (BY [PROSECUTOR])      I'm just going to —

THE COURT:    Overruled. Get some water and some tissue, a little break.

Q.      (BY [PROSECUTOR])      [V.N.], there's some tissue behind you, okay, and I'm going to pour you some water and bring it up.

A.      I'm fine.

THE COURT:      Just give you a minute.

[PROSECUTOR]:    And Your Honor, may I approach?

THE COURT:      Yes, you may.

[DEFENSE COUNSEL]:    Your Honor, can I ask for a sidebar?

THE COURT:      No. We'll have to do it outside the presence of the jury. Is it. . .

[DEFENSE COUNSEL]:    Yes.[9]

After the court excused the jury, defense counsel requested a mistrial, arguing that V.N. "referring to when he got out of jail" was a violation of the pretrial order prohibiting ER 404(b) evidence.[10]  The prosecutor argued that V.N.'s "mention was so brief. She did not specifically state that he got out of jail," and recommended "a limiting instruction . . . rather than a mistrial, given how brief the mention was and how vague it was."  The court denied the request for a mistrial because "the reference was vague enough and fast enough it did not unduly prejudice" Diaz-Barrientos.  The court also declined to give a limiting instruction, explaining, "I don't want to draw further attention to it."

---

[9] Ellipsis in original; emphasis added.

[10] ER 404(b) prohibits evidence of prior misconduct offered as substantive evidence. State v. Wilson, 60 Wn. App. 887, 891, 808 P.2d 754 (1991).

II. Second Motion

During defense counsel's cross-examination of V.N., the following

exchange took place:

> Q.      So, I wanted to just talk to you about the no-contact order.  You knew about the no-contact order back in April of 2013, right — or 2018?
> A.      Well, answer that question.
> Q.      Well. . .
> A.      Yes, I knew about that.
> Q.      Okay.  You also know that — you knew at the time that if you guys had contact, that Alberto can get in a lot of trouble, right?
> A.      I understand that.  But can I say something?
> Q.      It was a —
> A.      Yes, I knew that.
> Q.      Do you understand that?
> A.      I knew about that, but I quashed it, yeah.
> Q.      Okay.  You quashed it?
> A.      I quashed it when I gave him a chance on December when I came.  Yeah, I gave him a chance.  Yes, I did.
> Q.      You — you went to his house on April 13th — or April 13, 2018.  That's what you told the police officers?
> A.      I went to the house on April 13th?  No.  He checked in my phone call.  He called me and so I went there.  Yes, of course, because he called me.  <u>He just got out of jail in March</u>, and so I went to his house because I felt sorry for him.  Yes, I did.
>
>                [DEFENSE COUNSEL]:     Your Honor.
>                THE COURT:    All right.  The jurors would please put your note pads on your chairs and return to the jury room, please.[11]

Defense counsel moved a second time for a mistrial, arguing that V.N.'s

testimony again violated the court's pretrial order.  The court denied the motion

but struck V.N.'s answer and instructed the jury as follows:

> So, there was a question asked of [V.N.] regarding the no-contact order, and her response, everything in that response is stricken.  You are to disregard her answer to that question and any testimony that followed from that answer.

---

[11] Ellipsis in original; emphasis added.

Diaz-Barrientos claims that V.N.'s testimony on direct and cross-examination constitutes a serious irregularity because it impermissibly shifted the jury's attention to his propensity for criminality. We disagree. Here, the State charged Diaz-Barrientos with domestic violence felony violation of a no-contact order. At issue was whether he contacted and assaulted V.N. on April 13, 2018. V.N.'s testimony was unrelated to whether Diaz-Barrientos violated the no-contact order as charged and did not amount to propensity evidence.

Neither was the testimony a direct violation of the court's motion in limine precluding testimony about Diaz-Barrientos' criminal history. "[T]he fact that someone has been in jail does not necessarily mean that he or she has been convicted of a crime." State v. Condon, 72 Wn. App. 638, 649, 865 P.2d 521 (1993) (ambiguous statement about defendant having been in jail did not to warrant a mistrial); see also Hopson, 113 Wn.2d at 284-86 (statement that victim knew defendant " 'three years before he went to the penitentiary the last time' " did not materially affect the trial since there was no information concerning the nature or number of convictions).

Finally, although the testimony was not cumulative of other evidence, the court instructed the jury to disregard the improper portions of V.N.'s testimony. We presume the jury follows the instructions of the court. State v. Montgomery, 163 Wn.2d 577, 596, 183 P.3d 267 (2008). Diaz-Barrientos relies on Escalona and State v. Miles, 73 Wn.2d 67, 436 P.2d 198 (1968), to argue the court's curative instruction could not fix this irregularity. Such reliance is misplaced.

In Escalona, the State charged the defendant with second degree assault for threatening the victim with a knife. Escalona, 49 Wn. App. at 252. The victim testified that Escalona " 'already has a record' " and " 'had stabbed someone.' " Escalona, 49 Wn. App. at 253. We held this was propensity evidence because a jury could conclude that Escalona "acted on this occasion in conformity with the assaultive character he demonstrated in the past." Escalona, 49 Wn. App. at 256.

In Miles, the State charged the defendants with robbery. Miles, 73 Wn.2d at 67-68. The defendants challenged evidence of the contents of a "Teletype message" from the Yakima County Sheriff's Office describing two men wanted in a similar crime of robbery, their vehicle, and their intent to commit another robbery in Spokane. Miles, 73 Wn.2d at 68-69. In overturning the trial court's denial of the defendants' motion for a mistrial, our state Supreme Court held that the police officer's testimony "concerning an alleged plan to perpetrate a robbery like the one with the commission of which the defendants were charged" was "so prejudicial in nature that its effect upon the minds of the jurors could not be expected to be erased by an instruction to disregard it." Miles, 73 Wn.2d at 71.

The comments in this case do not rise to the serious irregularities in Escalona and Miles. The trial court did not abuse its discretion in denying Diaz-Barrientos' motions for a mistrial.

Cumulative Error

Finally, Diaz-Barrientos seeks reversal and a new trial under the cumulative error doctrine. The cumulative error doctrine requires reversal when

17

the combined effect of several errors denies the defendant a fair trial. State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial." Weber, 159 Wn.2d at 279. As discussed above, while the trial court erred in admitting Officer McDougald's testimony describing the condition of Diaz-Barrientos' apartment, the error was harmless and had no effect on the outcome of trial. Diaz-Barrientos is not entitled to a new trial due to cumulative error.

We affirm the jury conviction for domestic violence felony violation of a no-contact order.

_Brennan, J._

WE CONCUR:

_Leach, J._         _Appelwick, J._