**FILED**
**OCTOBER 19, 2021**
In the Office of the Clerk of Court
WA State Court of Appeals Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37172-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | OPINION PUBLISHED IN PART |
| | ) | |
| KEVIN EUGENE KELLY, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Kevin Kelly (Kelly) appeals from his conviction for violating a no

contact order when directing another person to text his wife, Julie Kelly (Julie). Kelly

assigns error to evidentiary rulings, the failure to deliver a jury unanimity instruction, and

alleged prosecutorial misconduct during jury summation. We find no error and affirm

Kelly's conviction.

## FACTS

We take the facts primarily from trial testimony. On April 16, 2019, during

defendant Kevin Kelly's appearance for a separate charge, the trial court entered a

domestic violence no contact order prohibiting Kelly from contacting, directly, indirectly,

or through others, his wife, Julie Kelly. This prosecution arises from the alleged

violation of the order. After the trial court entered the no contact order, the State of

Washington confined Kelly in the Spokane County Jail. Alexander Maravilla stayed in

the same cell as Kelly.

While Kevin Kelly was jailed, Julie Kelly received multiple telephone calls from

the Spokane County Jail. Julie either did not answer the call, or, when she did answer,

the caller disconnected immediately. Although Julie knew other people confined in the

Spokane County Jail, she assumed that Kelly sought to contact her, as she did not expect

anyone else from the jail to call her. Neither party explains why someone initiated the

call when he or she disconnected immediately.

At 8:32 a.m. on May 14, 2019, Julie Webster received a telephone call from her

son, Alexander Maravilla. Their call lasted fifteen minutes. The Spokane County Jail

recorded the telephone conversation between Maravilla and Webster. On the recording,

Maravilla states:

> "My cellie wants to know if you'd do him a favor. Text this number
> and see if his old lady will put ten bucks on his books or whatever and say
> that he loves her. . . . I don't know her name, you just say hi pumpkin, love
> and miss you, can you put ten bucks on my books."

Report of Proceedings (RP) at 10. During the call, Webster sent a text message to Julie

Kelly, which read, "'Hi, Pumpkin. I love and miss you. Is there any way you can put

$10 on my books?'" RP at 218. Webster did not recognize Julie Kelly's phone number,

2

nor did she know Kevin or Julie Kelly. Webster, as heard on the jail recording, affirmed to her son, Maravilla, that she sent the text message to Julie Kelly.

Julie Kelly believed that Kevin Kelly prompted the text message received from the unknown texter, because "he's the only one that calls me 'Punky' and I don't know anybody else in the jail that would say I love you and I miss you." RP at 172. Julie Kelly did not respond to Julie Webster's text message. Julie Kelly understood that the phrase "'putting money on the books'" referred to depositing money in an inmate's account for the purpose of purchasing goods while incarcerated. RP at 171.

After receiving Julie Webster's text message on May 14, 2019, Julie Kelly contacted a victim advocate. On May 16, 2019, Officer Kaitlyn Anderson interviewed Julie Kelly in her home. Officer Anderson contacted Officer Alisha Nguyen, of the Spokane Police Department, to investigate the phone calls and text message that Julie received.

Officer Alisha Nguyen reviewed Spokane County Jail telephone records to identify the inmates who called Julie Kelly. At trial, Officer Nguyen explained that the jail assigns each inmate a unique pin number used to make phone calls from jail. Officer Nguyen discovered that Julie received ten telephone calls from the jail. None of the calls originated from Kevin Kelly's pin number. Rather, three inmates' pin numbers had been used to contact Julie: Brendan Dalla, Anton Santrone, and Kelly's cellmate, Alexander Maravilla. All three of these inmates were on the same cellblock as Kelly.

PROCEDURE

The State of Washington charged Kevin Kelly with one count of felony violation of a no contact order. The State alleged that Kelly, with knowledge that an order prohibited contact, contacted Julie Kelly on May 14, 2019. The State also alleged that Kelly had been convicted at least twice before of violating no contact orders. Kelly stipulated that he garnered at least two earlier convictions for violating court orders.

Before trial, the State, pursuant to ER 801(d)(2)(v), sought to introduce statements uttered by Alexander Maravilla to his mother, Julie Webster, during the May 14, 2019 telephone call. The State argued that Maravilla spoke in a role as a coconspirator in furtherance of a conspiracy with Kevin Kelly. Alternatively, the State sought to introduce the directions of Maravilla to his mother for a nonhearsay purpose, its effect on the listener, Webster. The State never sought to play the recorded telephone conversation for the jury.

During argument on pretrial motions, the trial court commented that the State needed to establish by a preponderance of the evidence that Alexander Maravilla knew that a no contact order prohibited Kevin Kelly from contacting his wife in order to show a conspiracy between the cellmates. The court found that the State had not satisfied its burden and, therefore, ruled that the coconspirator exception did not apply.

Immediately after the trial court's ruling denying admission of the contents of the May 14 telephone call, the State moved for a trial continuance, so that it could subpoena

4

Alexander Maravilla and transport him from custody to testify. Kevin Kelly, through counsel, objected to a continuance because trial had been postponed before at the request of the State. Kelly further argued that the State should have planned in advance for the possibility that the trial court would deny admission of the telephone conversation. The trial court denied the motion for a trial continuance. The court commented that the State had made a strategic decision not to earlier subpoena Maravilla and that a continuance would prejudice Kelly.

During the pretrial motion hearing, the State also informed the trial court that it intended to ask Julie Webster, during trial testimony, why she sent the text message to Julie Kelly. The State remarked that Webster would answer that Alexander Maravilla asked her to send the message. The State argued that such testimony would not be offered for the truth of the out-of-court statement by Maravilla, but to show the statement's effect on Webster. Over Kevin Kelly's objection, the trial court ruled the statement of Maravilla to his mother, during the May 14 telephone conversation, was admissible as nonhearsay.

In his opening statement, Kevin Kelly, through counsel, asserted that Julie Kelly used her allegation that he violated the no-contact order to improve her position in the couple's upcoming divorce proceeding. Kelly highlighted that, shortly after the State charged him with a crime, his wife Julie filed for divorce.

5

At trial, the State called Julie Webster to testify. During direct examination, the following exchange occurred:

> Q How did you get that number [Julie Kelly's]?
> A My son was given it by somebody in the jail.
> MR. [JOSEPH] KUHLMAN [defense counsel]: Objection, Your Honor.
> THE COURT: Sustained.
> MR. KUHLMAN: Move to strike and request the jury to disregard.
> THE COURT: I will instruct the jury to disregard that last comment.
> Q (By Ms. [Hannah] Stearns [the State's attorney]) Ms. Webster, did your son provide that phone number to you?
> A Yes.

RP at 158. Julie Webster testified at trial that Maravilla asked her to send Julie Kelly the text message. Webster did not repeat any of the other content from the May 14 phone conversation with her son other than her son giving her the cell number to text. The trial court excluded testimony that someone in the jail had given Maravilla the cell phone number. Therefore, Webster did not testify that Kevin Kelly told her son to direct her to send the text message.

During cross-examination of Julie Webster, Kevin Kelly's counsel asked about Alexander Maravilla's jail sentence. The State objected to the question on relevancy grounds. The trial court overruled the objection. Webster then testified that Maravilla was serving five years, not for murder, but for another crime. Defense counsel probed further:

> So what about the other charge that he was looking at, that big murder charge? What is he serving—

6

RP at 161. The trial court then sustained the State's previous relevancy objection.

Counsel later asked Julie Webster, "Is this the effort of your son to work out a better deal

for himself?" RP at 161. After Webster responded in the negative, the trial court

sustained the State's objection to the question.

During defense counsel's cross-examination of Julie Kelly, counsel asked whether

she contacted law enforcement after receiving the text message from Julie Webster. The

following colloquy occurred:

> A  I called Jennifer (sic), my prosecuting attorney advocate.
> Q  Okay. So then—so you called the prosecutors and not even the police?
> A  I called my advocate, that's what she's there for.
> Q  So you're not worried. There's nothing threatening in this message but—
> A  It's from Kevin and Kevin's incarcerated and *Kevin had just choked me out*.
> MR. KUHLMAN: Excuse me, Your Honor, strike for nonresponsive [sic].
> THE COURT: Overruled.
> Q  (By Mr. Kuhlman) There is nothing in this message—he's in custody?
> A  Right.

RP at 175-76 (emphasis added).

Thereafter, defense counsel inquired about Kevin and Julie Kelly's pending

divorce proceeding: "And does a violation order charge help a divorce in your favor?"

RP at 177. The trial court sustained the State's objection to this question.

On the State's redirect examination of Julie Kelly, the following exchange

7

occurred regarding her upcoming divorce proceeding:

> Q  So why did you file for divorce?
> MR. KUHLMAN [defense counsel] Objection, Your Honor.  This is unduly prejudicial and a relevance issue.
> THE COURT: Overruled.  I'll allow recross as well.
> MR. KUHLMAN: Thank you.
> Q  (By Ms. Stearns [prosecuting attorney]) Why did you file for divorce, Ms. Kelly?
> A  *Because Mr. Kelly is a drug addict*.

RP at 179 (emphasis added).  Defense counsel objected to Julie Kelly's answer and moved the trial court to strike the answer.  The trial court sustained Kevin Kelly's objection and excused the jury.

Outside of the jury's presence, Kevin Kelly, through counsel, requested a curative instruction and a direction that Julie Kelly be prohibited from further testifying "along these lines."  RP at 180.  The State mentioned that it had previously objected to any testimony concerning a divorce, but the trial court overruled its objection.  The State's attorney continued:

> Once Mr. Kuhlman [defense counsel] brought it up I think it's appropriate the State respond.  The door has been opened.  The reason why she filed for divorce is appropriate since Mr. Kuhlman has insinuated that she filed for divorce in retaliation to make this case better.  If he's going to make those insinuations on the record, in opening statement and in his cross of Ms. Kelly, it is extremely appropriate that the State be able to respond and Ms. Kelly be able to respond.

RP at 180.

The trial court agreed with the State that Kevin Kelly had opened the door as to Julie Kelly's motives for seeking a divorce. Nevertheless, the court found Julie's reference to drugs to be highly prejudicial under ER 404(b). The trial court resustained Kelly's objection to Julie's comments about unlawful drugs and agreed to issue a curative instruction. The State clarified that it did not expect Julie to mention any drug use and assured the court that Julie's answer to the question of her reason for the divorce would relate to the couple's relationship being unhealthy. When the jury returned, the trial court struck Julie's statement about Kelly being a drug addict. Kelly elected not to further cross-examine Julie.

Officer Kaitlyn Anderson testified to Julie Kelly's demeanor when the officer interviewed her on May 16, 2019. Officer Anderson avowed that Julie "was upset from the start, she was crying. It was hard for her to talk and tell me why I was there." RP at 188.

During cross-examination by defense counsel, Officer Kaitlyn Anderson mentioned that she had not reviewed her body camera before testifying at trial. The following exchange then occurred:

> Q And when you get there, when you show up two days later can you again describe the demeanor of Ms. Kelly?
> A I believe she was crying, she seemed upset, she didn't—it was hard for her to get into really what was going on.
> . . . .
> Q . . . She's putting on this big emotional display for you when you go to take a statement from her?

9

A  Correct.

RP at 193.

During a recess, Officer Kaitlyn Anderson reviewed her body camera footage of

her interview with Julie Kelly.  After recess, she testified as follows:

> Q  . . .  So upon reviewing the body cam, what would be the correct
> representation of the demeanor of Ms. Kelly?
> A  Very down, choked up.
> Q  Was she calm?
> A  I would say calm, a little jumbled in her thoughts.
> Q  She wasn't crying, was she?
> A  I remember watery-eyed.
> Q  But she wasn't crying.
> A  (No response.)
> Q  Was she sobbing?
> A  Not sobbing.
> Q  Was she screaming?
> A  No.
> Q  *Was she distraught?*
> A  *No*.
> Q  *So any inference that we're trying to give the jury that she was, in
> fact, distraught or having some grand emotional response, that would be
> untrue*.
> A  *Okay, correct*.

RP at 210-11 (emphasis added).

During Officer Alisha Nguyen's testimony, defense counsel cross-examined her

regarding her experience with domestic violence orders being used as leverage in family

law matters:

> Q  . . .  Now, also, since you have so much experience with these,
> you've seen domestic violence orders can be used as leverage in family law
> hearings before?

MS. STEARNS [the State's attorney] Objection, Your Honor, no relevance.

THE COURT: Sustained.

Q  (By Mr. Kuhlman) Have you ever seen a pretrial no-contact order used in an offensive manner instead of a defensive matter [sic]?

A  I don't know what peoples' outlook at it is if there's a no-contact order violation or not.

Q  So you've had no interest, you have never followed through, you have never worked with prosecutors to see if someone inappropriate is using an order?

A  It would be speculation on our part.  I don't know if that's actually the case.

Q  So you just arrest them and you're done?

A  Well, no, we follow through with the case.

Q  So you follow through.  Have you ever seen that?

A  Some people might be going through a divorce or something.  I can't prove that.

Q  I am not asking you to prove it, Officer.  I'm asking have you seen it?

MS. STEARNS: Your Honor, I'll object.  It calls for speculation.

THE COURT: Sustained.

RP at 220-21.

During the trial court's jury instruction conference, Kevin Kelly voluntarily withdrew all of his proposed jury instructions except for an instruction about Kelly's right not to testify and a missing witness instruction based on Alexander Maravilla's absence from trial.  In response, the State argued that Kelly failed to satisfy all of the elements required for a missing witness instruction.  The State contended that the State did not control Maravilla, that Kelly could have subpoenaed Maravilla, and that the State did not intentionally fail to call Maravilla to the stand.

11

The trial court decided to deliver a missing witness instruction. The court concluded that the State controlled Alexander Maravilla and that Maravilla was a critical witness.

In its closing argument, the State referred to Julie Webster's testimony:

> That text message, the one we've been talking about this whole trial, was sent from Ms. Webster's phone to Ms. Kelly's phone. Ms. Webster sent that message at the direction of her son, Alexander Maravilla. While Ms. Webster was on the phone with her son on May 14th, 2019, she sent the message to Julie Kelly. While Ms. Webster was on the phone with her son, Mr. Maravilla, he was cellmates with Kevin Kelly.
> You heard from Ms. Webster that the phone number, Ms. Kelly's phone number, came to her from her son. She didn't know that number; she never met Ms. Kelly. *Mr. Kelly's cellmate gave his mother Ms. Kelly's phone number*.
> On that day of May 14th, 2019, Mr. Kelly and Mr. Maravilla were cellmates on 5 West, Cell 16. They were cellmates the day the violation of no-contact order occurred.

RP at 292 (emphasis added). Kevin Kelly did not object to this portion of the State's argument.

During closing argument, the State discussed the ten phone calls that Julie Kelly received from the Spokane County jail:

> Prior to that and during that period, Ms. Kelly received ten phone calls from the jail, all of which were from 5 West, all of which were from the pin numbers from persons residing on the same floor as Mr. Kelly. Those calls included calls from Mr. Maravilla's pin number as well as Mr. Dalla and Mr. Santrone. Ms. Kelly testified that she did not know those people.
> Officer Nguyen testified about her role in the domestic violence unit with the Spokane Police Department, that this tactic, using other peoples' pin numbers to hide your identity is very common in domestic violence

12

cases. That an inmate will use somebody else's pin number so that their name is not associated with the phone call that violates the no-contact order.

She further testified that one of the persons whose pin number was used, Mr. Dalla, is known to law enforcement for doing this very thing. He's given his pin number out previously for the same reason.

RP at 292-93.

The State analyzed for the jury the elements of the charged crime. The State's attorney commented: "Here Ms. Kelly received a text message that she knows is from her husband, Kevin Kelly." RP at 298. The State then highlighted the ten phone calls Kelly allegedly made to try to contact Julie. State's counsel added: "when he couldn't get through to her by phone, he resorted to a text message." RP at 299.

During closing, the State examined Alexander Maravilla's and Julie Kelly's motivations:

What do we not have as evidence? We do not have a motive from Mr. Maravilla. There is no motivation in evidence or for why he would or would not be here. That's not evidence, you cannot consider it.

We also don't have a motive for Ms. Kelly. There's no motive for her to lie, to make up accusations, to come in here and testify falsely. There's no evidence. That cannot be considered.

RP at 321.

The State reviewed, for the jury, Officer Kaitlyn Anderson's testimony regarding Julie Kelly's demeanor when she reported the text message from Julie Webster:

And she [Officer Anderson] testified initially that she [Julie Kelly] was upset and distraught, and after watching her body camera *she testified again that Ms. Kelly was upset and distraught*.

13

MR. KUHLMAN: Objection, Your Honor. Mischaracterization of evidence.

THE COURT: Overruled.

MS. STEARNS: The officer clearly said she had watery eyes, she was upset, she was anxious, she was crying. Upset and *distraught*. There's no change in demeanor, there's no grand elaborate plan to frame Mr. Kelly.

RP at 325 (emphasis added).

The trial court instructed the jury that, to convict Kevin Kelly, the State needed to prove beyond a reasonable doubt that "on or about May 14, 2019," with knowledge of the existence of a no-contact order, Kelly violated the order. Clerk's Papers (CP) at 41. The jury found Kevin Kelly guilty of felony violation of a no-contact order against a member of his family or household.

## LAW AND ANALYSIS

On appeal, Kevin Kelly assigns six trial errors. First, the trial court erred when admitting Alexander Maravilla's out-of-court statement to his mother to show its effect on the listener when the State primarily used the statement to prove that Maravilla directed his mother to contact Julie Kelly. Second, the trial court interfered in Kelly's constitutional right to present a defense by prohibiting him from questioning Julie Webster, Julie Kelly, and Alisha Nguyen about the motive behind his accusers' allegations and precluding questions that would undermine the accusers' credibility. Third, the trial court thereby also interfered in Kelly's right to effectively argue, during closing, the lack of credibility of his accusers, which interference also violated Kelly's

14

right to present a defense. Fourth, the trial court erred by refusing to strike Julie Kelly's irrelevant, prejudicial, and nonresponsive answer regarding Kelly's alleged domestic violence. Fifth, the prosecuting attorney committed misconduct during closing argument by arguing facts not in evidence and vouching for the credibility of Julie. Sixth the trial court erred when failing to deliver a jury unanimity instruction.

The State cross-appeals. The State assigns error to the trial court's refusal to permit the playing of the jail recording of the conversation between Alexander Maravilla and Julie Webster. The State claims the coconspirator rule authorized the playing. Since we affirm the conviction of Kevin Kelly, we do not address the cross-appeal.

Alexander Maravilla's Directions to his Mother

*Issue 1: Whether testimony from Julie Webster that her son directed her to contact Julie Kelly constituted inadmissible hearsay?*

*Answer 1: No.*

Kevin Kelly argues that the trial court erroneously admitted testimony from Julie Webster that her son, Alexander Maravilla, told her by phone to text Julie Kelly. Kelly does not object to the State's closing argument, during which the prosecutor argued that Kelly asked Alexander Maravilla to direct Maravilla's mother to text Julie. The State responds that it introduced Maravilla's statement as evidence to explain why Julie Webster sent the text message to Julie Kelly, a nonhearsay purpose. Kelly asserts that, while the State professed to introduce the statement to show the effect on Webster, the

listener, the State offered the statement to prove the truth of the matter asserted—that

Maravilla directed his mother to text Julie Kelly.

We decide this issue on a related, but distinct, basis than argued by the State.  The

Court of Appeals may uphold the trial court on a proper basis even though the trial court

did not rely on that particular theory.  *State v. Heiner*, 29 Wn. App. 193, 198, 627 P.2d

983 (1981).  Because the challenged remarks of Alexander Maravilla to his mother were

in the nature of a request, the comment was not hearsay.  Thus, we need not assess the

State's reason for introducing the testimony.

This court reviews whether a statement is hearsay de novo.  *State v. Edwards*, 131

Wn. App. 611, 614, 128 P.3d 631 (2006).  Hearsay is generally inadmissible, except as

permitted by evidence rules, other court rules, or by statute.  ER 802.

> "Hearsay" is a *statement*, other than one made by the declarant while
> testifying at the trial or hearing, offered in evidence to prove the truth of the
> matter asserted.

ER 801(c) (emphasis added).  In turn,

> [A] "statement" is (1) an oral or written assertion or (2) nonverbal
> conduct of a person, if it is intended by the person as an assertion.

ER 801(a).  Under the hearsay rule, a "statement" is "a declaration of matters of fact."

*Eagle v. Unemployment Compensation Board of Review*, 659 A.2d 60, 62 (Pa. Commw.

Ct. 1995).

16

Pursuant to ER 801(a), a nonassertive statement does not constitute hearsay. *State v. Modest*, 88 Wn. App. 239, 249, 944 P.2d 417 (1997); *State v. Collins*, 76 Wn. App. 496, 498-99, 886 P.2d 243 (1995). For example, an inquiry is not hearsay because the questioner is not asserting a fact or a belief. *State v. Collins*, 76 Wn. App. 496, 498-99 (1995). In *State v. Collins*, a prosecution for possession of cocaine with the intent to deliver, this court affirmed the admission of a police officer's testimony that he answered the phone at the defendant's apartment and callers asked for the defendant by name. The truth of the name of the defendant was irrelevant, only that callers mentioned his name.

When we speak of proving the truth of the matter asserted we can only be speaking of a factual assertion, not an order or a command, not a question or a request. *Eagle v. Unemployment Compensation Board of Review*, 659 A.2d 60, 62 (Pa. Commw. Ct. 1995). The hearsay rule does not forbid the introduction of evidence that a request has been made when the making of the request is significant irrespective of the truth or falsity of its content. *Taylor v. Centennial Bowl, Inc.*, 65 Cal. 2d 114, 125, 416 P.2d 793, 52 Cal. Rptr. 561 (1966).

In a handicap discrimination case, the employee's spouse's request for an accommodation did not constitute hearsay. *Adams v. Crestwood Medical Center*, 504 F. Supp. 3d 1263 (N.D. Ala. 2020). In an unemployment compensation case, directions by the work manager to the employee also did not constitute hearsay. *Eagle v. Unemployment Compensation Board of Review*, 659 A.2d 60, 62 (Pa. Commw. Ct.

17

1995).  In *Taylor v. Centennial Bowl, Inc.*, 65 Cal. 2nd 114, 125 (1966), a victim's

request for police assistance was ruled as admissible.  Finally, in *Texas Employment*

*Insurance Association v. Fish*, 266 S.W.2d 435 (Tex. Civ. App. 1954), a worker

compensation claim, the court held admissible, as not hearsay, the employee's testimony

that his supervisor told him to quit his job.

Alexander Maravilla's direction to his mother to contact Julie Kelly was assertive

in the nature of being bossy or forward.  But, the direction was not assertive in the sense

of declaring a fact or belief.  The truthfulness of Alexander Maravilla's request was

irrelevant.  The request was relevant to the prosecution simply by the fact that Maravilla

uttered the entreaty.

A majority of this panel has determined that only the foregoing portion of this

opinion will be printed in the Washington Appellate Reports.  Therefore, it is ordered that

the remainder of this opinion, having no precedential value, shall be filed for public

record pursuant to RCW 2.06.040.

Right to a Defense and Right to a Summation

Kevin Kelly argues that the trial court violated his right to present a defense and

his right to summation by prohibiting him from questioning: (1) Julie Kelly regarding her

motivation to improve her position in the couples' divorce proceeding, (2) Officer Alisha

Nguyen regarding her experience with people who use no-contact orders to gain leverage

in family law proceedings, and (3) Julie Webster regarding Alexander Maravilla's potential motivation behind asking Webster to send a text message to Julie.

The Sixth Amendment to the United Stated Constitution and article I, section 22 of the Washington State Constitution guarantee a criminal defendant's right to present a defense. *State v. Strizheus*, 163 Wn. App. 820, 829-30, 262 P.3d 100 (2011). Defendants do not, however, possess a constitutional right to present irrelevant evidence. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). The proponent of the evidence bears the burden of showing relevance and materiality of the testimony. *State v. Pacheco*, 107 Wn.2d 59, 67, 726 P.2d 981 (1986). "Evidence is relevant if it has a tendency to make the existence of any fact of consequence more probable or less probable than it would be without the evidence." *State v. Darden*, 145 Wn.2d 612, 624, 41 P.3d 1189 (2002).

This court usually reviews a trial court's evidentiary rulings based on relevance for abuse of discretion. *State v. Clark*, 187 Wn.2d 641, 648, 389 P.3d 462 (2017). A trial court abuses its discretion when its decision is manifestly unreasonable, its discretion is exercised on untenable grounds or for untenable reasons, or if the court applies the wrong legal standard. *T.S. v. Boy Scouts of America*, 157 Wn.2d 416, 423-24, 138 P.3d 1053 (2006). But if the trial court excluded relevant defense evidence, then this court reviews de novo whether the exclusion violated the defendant's right to present a defense. *State v. Clark*, 187 Wn.2d at 648-49. Whether excluding testimony violates a defendant's right to present a defense "depends on whether the omitted evidence evaluated in the context

of the entire record, creates a reasonable doubt that did not otherwise exist." *State v. Duarte Vela*, 200 Wn. App. 306, 326, 402 P.3d 281 (2017).

The constitutional right to present a defense includes a right to confront and cross-examine adverse witnesses. U.S. CONST. amend. VI; CONST. art. I, § 22; *State v. Jones*, 168 Wn.2d 713, 720 (2010). In turn, the constitutional right to cross-examine a witness extends to the right to expose a witness' motivation in testifying. *Davis v. Alaska*, 415 U.S. 308, 316-17, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). A criminal defendant deserves extra latitude in cross-examination to show motive or credibility, especially with regards to a key prosecution witness. *State v. York*, 28 Wn. App. 33, 36, 621 P.2d 784 (1980).

*Issue 2: Whether the trial court impeded Kevin Kelly's constitutional right to present a defense when the trial court precluded him from cross-examining Julie Kelly about her motive to improve her position in divorce proceedings?*

*Answer 2: Yes.*

We separately address now the three times about which Kevin Kelly complains the trial court interfered in his cross-examining witnesses. First, Kevin Kelly contends that the trial court improperly forbade him from questioning Julie Kelly as to her motivation for seeking a divorce. Kelly sought to elicit testimony that Julie used Kelly's alleged violation of the no-contact order to better position herself in the couples' upcoming divorce proceeding.

20

The State responds that the trial court permitted Kevin Kelly to further question Julie about this motivation. According to the State, Kelly, after gaining permission, tactically and wisely chose not to recross-examine Julie because questions about her reasons for seeking a divorce could have elicited testimony about the couple's past history of domestic violence. In reply, Kelly maintains that the trial court only allowed the State, not him, to further inquire as to Julie's motives for the divorce. He contends that, regardless, Julie's motive for obtaining a divorce differs from her motive for alleging that he violated the no-contact order.

During his opening statement, Kevin Kelly told the jury that Julie used the alleged violation of the no-contact order to bolster her position in their upcoming divorce proceeding. Kelly noted that Julie almost immediately filed for divorce after the State charged him with the pending crime. When Kelly's counsel cross-examined Julie, counsel inquired: "And does a violation order charge help a divorce in your favor?" RP at 177. The State objected and the trial court sustained the objection.

During the State's redirect examination of Julie Kelly, the following exchange occurred regarding the upcoming divorce proceeding:

> Q  So why did you file for divorce?
> MR. KUHLMAN [defense counsel]: Objection, Your Honor. This is unduly prejudicial and a relevance issue.
> THE COURT: Overruled. *I'll allow recross as well.*
> MR. KUHLMAN: Thank you.
> Q  (By Ms. Stearns [prosecuting attorney]) Why did you file for divorce, Ms. Kelly?

21

RP at 179 (emphasis added).  Outside of the jury's presence, the State argued that Kevin Kelly's question insinuated that Julie held an ulterior motive for claiming Kelly contacted her, and, in fairness, the State should be allowed to ask Julie about her reasons for seeking a divorce.  The trial court agreed that Kelly had opened the door to this line of questioning and allowed the State's redirect examination to continue.

Kevin Kelly mistakenly maintains that the trial court allowed only the State to elicit testimony regarding Julie Kelly's motives for seeking a divorce.  The trial court, in response to Kelly's objection to the State's asking Julie about the divorce, ruled that it would "allow recross as well."  RP at 179.

The trial court expressly permitted Kevin Kelly to ask Julie questions as to her motives for divorce.  After the State's questioning, Kelly elected not to recross-examine Julie.  He stated, "No further cross, Your Honor."  CP at 86.

We agree, however, with Kevin Kelly that Julie Kelly's motive for obtaining a divorce differs from her motive for alleging that he violated the no-contact order.  Though the trial court did not specify the limitations for recross-examination, the trial court never reexamined its ruling precluding questioning Julie about whether her assertions bettered her interests in the marital dissolution proceeding.  As Kelly asserts, Julie Kelly's motivations for accusing Kelly of a crime constituted relevant evidence. *State v. York*, 28 Wn. App. 33, 36 (1980).

22

*Issue 3: Whether the interference with Kevin Kelly's right to cross-examine Julie Kelly with regard to her motivations behind claiming Kelly contacted her constitutes harmless error?*

*Answer 3: Yes.*

Whether the trial court violated Kevin Kelly's right to cross-examine "depends on whether the omitted evidence evaluated in the context of the entire record, creates a reasonable doubt that did not otherwise exist." *State v. Duarte Vela*, 200 Wn. App. 306, 326 (2017). The State contends that Kelly's claim that Julie Kelly had ulterior motives in bringing the allegations in this prosecution would not have created a new doubt as to his guilt. The State asserts that Kelly's theory of ulterior motives does not explain away or discount the other evidence against him. We agree.

Kevin Kelly intended to question Julie Kelly regarding her motive to fabricate her allegations that he violated the no-contact order against him. The record does not reinforce Kelly's defense theory. Julie Webster sent Julie Kelly a text message, when Webster neither knew the Kellys nor recognized Julie Kelly's phone number. Similarly, Julie Kelly did not recognize Webster's phone number, nor did she know Webster. In Webster's text message, she referred to Julie as "Pumpkin," which is Kelly's affectionate nickname for his wife. Webster sent the text message while on the phone with her son, Alexander Maravilla, and while Maravilla shared a cell with Kelly. The record, as a

whole, overwhelmingly supports the jury's verdict. Julie Kelly's excluded testimony would not have created a new doubt as to Kelly's guilt.

*Issue 4: Whether the trial court impeded Kevin Kelly's constitutional right to present a defense when the trial court precluded him from cross-examining Officer Alisha Nguyen about the possibility that an allegation of violating a no-contact order could benefit the defendant's spouse during a divorce proceeding?*

*Answer 4: No, because Officer Nguyen answered the posed questions.*

Kevin Kelly also argues that the trial court erroneously prohibited him from questioning Officer Alisha Nguyen as to how a no-contact order violation could benefit Julie Kelly in seeking a divorce. He contends that asking Officer Nguyen about her past experience in dealing with domestic violence allegations did not call for speculation. The State responds that Kelly's line of questioning both called for speculation and had been asked and answered.

During defense counsel's cross-examination of Officer Alisha Nguyen, he asked her about her experience with domestic violence orders being used to leverage family law matters:

> Q . . . Now, also, since you have so much experience with these, you've seen domestic violence orders can be used as leverage in family law hearings before?
> MS. STEARNS: Objection, Your Honor, no relevance.
> THE COURT: Sustained.
> Q (By Mr. Kuhlman) Have you ever seen a pretrial no-contact order used in an offensive manner instead of a defensive matter [sic]?

24

> A  I don't know what peoples' outlook at it is if there's a no-contact order violation or not.
>
> Q  So you've had no interest, you have never followed through, you have never worked with prosecutors to see if someone inappropriate is using an order?
>
> A  It would be speculation on our part.  I don't know if that's actually the case.
>
> Q  So you just arrest them and you're done?
>
> A  Well, no, we follow through with the case.
>
> Q  So you follow through.  Have you ever seen that?
>
> A  Some people might be going through a divorce or something.  I can't prove that.
>
> Q  I am not asking you to prove it, Officer.  I'm asking have you seen it?
>
> MS. STEARNS: Your Honor, I'll object.  It calls for speculation.
>
> THE COURT: Sustained.

RP at 220-21.

Kevin Kelly's questioning related to his theory that Julie Kelly alleged he violated the no-contact order in order to benefit herself in the couple's upcoming divorce proceeding.  As the State asserts, Officer Nguyen responded that she did not know whether people she dealt with were going through a divorce.  She also indicated that any answer she would give regarding the offensive use of no-contact order violations would e speculation on her part.  Presumably, Nguyen deemed any answers to be speculative because she lacked personal knowledge that individuals offensively utilize no-contact orders.

This court may affirm a lower court's ruling on any grounds adequately supported in the record.  *State v. Costich*, 152 Wn.2d 463, 477, 98 P.3d 795 (2004).  The trial court

25

sustained the State's objection to Kevin Kelly's questioning on speculation grounds. Nevertheless, the record supports that Officer Alisha Nguyen had answered defense counsel's questions before counsel asked his final question, "I'm asking have you seen it?" RP at 221. Thus, we affirm the trial court's ruling on the basis that Officer Alisha Nguyen answered the questions.

*Issue 5: Whether the trial court impeded Kevin Kelly's constitutional right to present a defense when the trial court precluded him from cross-examining Julie Webster about a possible motive for Alexander Maravilla to set Kelly up for criminal charges?*

*Answer 5: No.*

Finally, Kevin Kelly asserts that the trial court wrongfully prohibited him from eliciting testimony from Julie Webster concerning a potential motive behind Alexander Maravilla's allegations. Kelly argues that ER 806 permitted him to attack Maravilla's credibility, because the State introduced Maravilla's statement to prove the truth of the matter asserted—that Maravilla gave Julie Kelly's phone number to his mother.

The State responds that Alexander Maravilla's credibility had no bearing on this case, because he did not testify and because the State admitted his statement to his mother only for the effect on the listener. The State contends that ER 806 did not apply in this case, because Maravilla's statement was offered for a nonhearsay purpose: to explain why Julie Webster sent the text message to Julie Kelly. Finally, the State argues that,

26

according to Kevin Kelly's defense counsel, Maravilla had been sentenced and would not "play ball with the State."  RP at 246.

Kevin Kelly replies that the State's reliance on counsel's statement that Alexander Maravilla had already been sentenced is misplaced.  Kelly highlights that his counsel made this statement in response to the State's argument opposing the missing witness instruction.  Kelly argues that, at the time Maravilla contacted his mother, he may have still been trying to reach a deal with the State, given that he was in jail, not prison.

ER 806 governs when a declarant's credibility may be attacked or supported.  The rule declares, in relevant part:

> When a *hearsay statement*, or a statement defined in rule 801(d)(2)(iii), (iv), or (v), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness.

(Emphasis added.)  Thus, ER 806 does not apply to statements offered for a nonhearsay purpose as argued by the State.

Of course, we have already ruled that Alexander Maravilla's request to his mother did not constitute hearsay.  Therefore, ER 806 does not control.  The trial court did not err in precluding testimony possibly impeaching Maravilla.

*Issue 6: Whether the trial court impeded Kevin Kelly's constitutional right to present a defense when the trial court's evidentiary rulings precluded Kelly from certain arguments during summation?*

*Answer 6: No, because the trial court only committed one error that was harmless.*

Kevin Kelly contends that the trial court's three alleged errors, outlined above, also prohibited him from fully exercising his right to summation. Kelly asserts that, by disallowing him from eliciting testimony relating to his accusers' motivations, he could only meekly suggest to the jury, during closing argument, that it should question Julie Kelly's and Alexander Maravilla's motives. He argues that, while he was able to question their motivations during closing, he could not point to testimony to strengthen his argument or make supported inferences.

The State responds that the trial court did not limit Kevin Kelly's scope of argument during closing. The State argues that the trial court simply excluded evidence, which did not prohibit Kelly from making inferences that either Julie Kelly or Alexander Maravilla lacked credibility due to ulterior motives.

The Sixth Amendment right to counsel includes the right to make a closing summation to the jury. U.S. CONST. amend. VI; CONST. art. 1, § 22; *State v. Frost*, 160 Wn.2d 765, 772-73, 161 P.3d 361 (2007). Thus, when a trial court unduly limits the scope of defense counsel's closing argument, the court may infringe on a defendant's Sixth Amendment right to counsel. *Herring v. New York*, 422 U.S. 853, 863, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975). Nevertheless, a presiding judge enjoys great latitude in controlling the duration and limiting the scope of closing summations. *Herring v. New York*, 422 U.S. 853, 862 (1975).

28

We agree with the State. The trial court did not limit the scope of Kevin Kelly's closing argument. The trial court's limiting of Kelly's ability to examine witnesses is unrelated to his right to summation.

Julie Kelly Testimony of Domestic Violence

Kevin Kelly contends that the trial court should have stricken Julie Kelly's response, during cross-examination, that Kelly choked her because the response was irrelevant, unduly prejudicial, and nonresponsive to the pending question. Kelly further argues that Julie's comment related to earlier alleged acts of domestic violence was admissible under ER 404(b) only for limited purposes. Kelly asserts that the trial court failed to engage in ER 404(b)'s analysis, and, because past acts of domestic violence are particularly damning, the trial court committed prejudicial, reversible error.

The State responds that, while Kevin Kelly objected to Julie Kelly's comment of violence on the ground that Julie was nonresponsive, he did not object on relevance or prejudice grounds. Thus, he failed to preserve any objection based on irrelevance or prejudice. The State further asserts that the trial court did not abuse its discretion in overruling Kelly's nonresponsive objection.

*Issue 7: Whether Kevin Kelly preserved the arguments that Julie Kelly's comments on domestic violence were inadmissible as irrelevant and unduly prejudicial under ER 404(b) and ER 403?*

*Answer 7: No.*

29

During Kevin Kelly's counsel's cross-examination of Julie Kelly, counsel asked

whether Julie had contacted law enforcement after receiving the text message from Julie

Webster. The following exchange then transpired:

> A  I called Jennifer (sic), my prosecuting attorney advocate.
> Q  Okay.  So then—so you called the prosecutors and not even the
> police?
> A  I called my advocate, that's what she's there for.
> Q  So you're not worried.  There's nothing threatening in this
> message but—
> A  It's from Kevin and Kevin's incarcerated and *Kevin had just
> choked me out*.
> MR. [JOSEPH] KUHLMAN: Excuse me, Your Honor, strike for
> nonrespensiveness.
> THE COURT: Overruled.
> Q  (By Mr. Kuhlman) There is nothing in this message—he's in
> custody?
> A  Right.

RP at 175-76 (emphasis added).

RAP 2.5(a) governs errors raised initially on appeal, and states, in relevant part:

> The appellate court may refuse to review any claim of error which
> was not raised in the trial court.  However, a party may raise the following
> claimed errors for the first time in the appellate court: (1) lack of trial court
> jurisdiction, (2) failure to establish facts upon which relief can be granted,
> and (3) manifest error affecting a constitutional right.

A failure to object to an error at trial robs the trial court of the opportunity to

correct the error and avoid a retrial.  *State v. Powell*, 166 Wn.2d 73, 82, 206 P.3d 321

(2009).  This court will not reverse the trial court's decision to admit evidence when the

trial court rejected the specific ground upon which the defendant objected to the evidence

and then, on appeal, the defendant argues for reversal based on an evidentiary rule not raised at trial. *State v. Powell*, 166 Wn.2d 73 at 82. Stated differently, a party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial. *State v. Koepke*, 47 Wn. App. 897, 911, 738 P.2d 295 (1987).

Kevin Kelly relies on *Lundberg v. Baumgartner*, 5 Wn.2d 619, 106 P.2d 566 (1940) in support of an argument that he can raise new grounds for exclusion on appeal. There the Washington Supreme Court relied on 26 R.C.L. 1051, § 57, the former rule governing general objections. The rule declared, in relevant part:

> There may be cases, of course, where the incompetency of the evidence is so palpable that a *mere general objection will be deemed sufficient*. . . . Again, where the portion of the evidence objected to *is clearly pointed out, and its illegality is apparent on its face, then the objection must be allowed*. Indeed, the very reason why the court may disregard objections to evidence, when the particular grounds of the objection are not stated, is that the court would have to cast about or look for the grounds on which the objection was made. But when the evidence objected to is clearly designated, and on its face it is illegal, without inquiry into any fact aside from the evidence itself, the objection *cannot be disregarded merely because no specific ground of objection is stated*.

*Lundberg v. Baumgartner*, 5 Wn.2d at 626-27 (emphasis added). Kelly argues that, pursuant to *Lundberg*, he need not have objected on relevance or prejudice grounds in response to Julie Kelly's response because her response was clearly irrelevant and prejudicial. He does not explain why his competent trial counsel did not object on such ringing bases.

31

As the State spotlights, *Lundberg v. Baumgartner* predates the Rules of Appellate Procedure (RAP), adopted in 1976. *State v. Robinson*, 153 Wn.2d 689, 695, 107 P.3d 90 (2005). In *State v. Robinson*, the state high court held that the rules governing personal restraint petitions, RAP 16.3-.15, "superseded the relief previously available under former CrR 7.7" and refused to apply former CrR 7.7. *State v. Robinson*, 153 Wn.2d at 695-96. Accordingly, the RAPs generally supersede former rules.

Kevin Kelly replies that at least two decisions stand for the proposition that courts sometimes rely on principles announced before the adoption of the RAPs. *Harper v. State*, 192 Wn.2d 328, 429 P.3d 1071 (2018); *State v. Saltarelli*, 98 Wn.2d 358, 655 P.2d 697 (1982). We refuse to follow this presumed proposition because recent Washington decisions unanimously hold that a reviewing court will not reverse a trial court's evidentiary decision when a defendant objects on appeal to the decision on an evidentiary ground not raised before the trial court. *State v. Powell*, 166 Wn.2d 73, 82 (2009); *State v. Koepke*, 47 Wn. App. 897, 911 (1987). Furthermore, RAP 2.5(a) allows this court to refuse to hear new arguments raised for the first time on appeal.

*Issue 8: Whether the trial court erred when denying Kevin Kelly's request to strike Julie Kelly's answer as nonresponsive?*

*Answer 8: No.*

In answering the next issue, we note that Kevin Kelly's defense counsel, during the challenged exchange with Julie Kelly, in part posited statements as opposed to asking

questions, not that there is anything wrong with that. Nevertheless, defense counsel,

through his comments wanted the jury to conclude that the text sent to Julie did not

threaten her. Kelly's counsel wanted to establish that Julie first called her advocate, not

law enforcement. When positing this statement and when asking leading questions,

defense counsel opened the door for Julie to explain why the text frightened her,

including the background of domestic violence. If Julie had not mentioned the choking

in response to defense counsel's question, we suspect the State would have asked Julie to

explain her fright, and the trial court would have permitted the question because of the

open door.

This court reviews a trial court's evidentiary rulings for abuse of discretion.

*Peralta v. State*, 187 Wn.2d 888, 894, 389 P.3d 596 (2017). A trial court abuses its

discretion when its decision is manifestly unreasonable, its discretion is exercised on

untenable grounds or for untenable reasons, or if the court applied the wrong legal

standard. *T.S. v. Boy Scouts of America*, 157 Wn.2d 416, 423-24 (2006).

The State relies on *Henry v. Navy Yard Route*, 94 Wash. 526, 162 P.2d 584

(1917). In that case, the Washington Supreme Court held that, if a witness anticipates the

question he or she will be asked on examination and answers it, the examiner cannot

challenge the answer as nonresponsive:

> While a cross-examiner is not so far at the mercy of a designing
> witness that he must accept every voluntary statement made by such a
> witness whether or not it is relevant or responsive to his questions, *yet he*

33

*cannot complain if the witness anticipates him and answers concerning the matter of which he is evidently inquiring before the direct interrogation is put to him.*

*Henry v. Navy Yard Route*, 94 Wash. at 529 (emphasis added).

We conclude that Julie Kelly similarly anticipated questions that would be asked, if not a question that had already been asked. The trial court did not abuse its discretion when overruling the objection of nonresponsiveness.

Prosecutorial Misconduct during Closing

*Issue 9: Whether the State's attorney committed misconduct by arguing facts not in evidence?*

*Answer 9: Yes, but not to the prejudice of Kevin Kelly.*

Kevin Kelly argues that the prosecutor committed misconduct during closing by arguing facts inconsistent with the evidence to vouch for the credibility of Julie Kelly. Specifically, Kelly challenges the prosecutor's statement that Officer Kaitlyn Anderson testified, after reviewing her body camera footage, that Julie appeared upset and distraught during their interaction. Kelly maintains that the State's argument mischaracterizes Officer Anderson's testimony, because Officer Anderson testified that Julie was not distraught during their interaction. Kelly contends that, by falsely retelling Officer Anderson's testimony, the State conveyed to the jury that it had no reason to doubt that he indirectly sent Julie the text message. The State responds that the evidence

supported its counsel's remarks about Julie's demeanor during her interview with Officer

Kaitlyn Anderson.

To prove prosecutorial misconduct, a defendant must show the prosecuting

attorney's conduct was both improper and prejudicial. *State v. Fisher*, 165 Wn.2d 727,

747 (2009). In closing argument, the prosecuting attorney enjoys a wide latitude in

drawing and expressing reasonable inferences from the evidence. *State v. Hoffman*, 116

Wn.2d 51, 94-95, 804 P.2d 577 (1991). But a prosecutor commits misconduct by urging

the jury to decide a case based on evidence outside the record. *State v. Pierce*, 169 Wn.

App. 533, 553, 280 P.3d 1158 (2012). A prosecutor also commits misconduct when

improperly vouching for a witness. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389

(2010). A prosecutor improperly vouches when indicating that evidence not presented at

trial supports the witness's testimony. *State v. Ish*, 170 Wn.2d 189, 196 (2010).

A prosecutor's misconduct causes prejudice when there exists a substantial

likelihood that the conduct affected the jury's verdict. *State v. Emery*, 174 Wn.2d 741,

760, 278 P.3d 653 (2012). We review the prejudicial effect of the prosecutor's comments

in the context of the State's total argument. *State v. McKenzie*, 157 Wn.2d 44, 52, 134

P.3d 221 (2006).

At trial, Officer Kaitlyn Anderson testified, in response to the State's questioning,

as to Julie Kelly's demeanor when she interviewed Julie on May 16, 2019. Officer

Anderson first noted that Julie "was upset from the start, she was crying. It was hard for

her to talk and tell me why I was there." RP at 188. Later, during cross-examination,

Officer Anderson testified that Julie encountered difficulty communicating because of her

crying and "big emotional display." RP at 193.

During a recess, Officer Kaitlyn Anderson reviewed her body camera footage of

her interaction with Julie Kelly. After recess, Anderson testified as follows:

> Q . . . So upon reviewing the body cam, what would be the correct
> representation of the demeanor of Ms. Kelly?
> A Very down, choked up.
> Q Was she calm?
> A I would say calm, a little jumbled in her thoughts.
> Q She wasn't crying, was she?
> A I remember watery-eyed.
> Q But she wasn't crying.
> A (No response.)
> Q Was she sobbing?
> A Not sobbing.
> Q Was she screaming?
> A No.
> Q *Was she distraught?*
> A *No.*
> Q *So any inference that we're trying to give the jury that she was, in
> fact, distraught or having some grand emotional response, that would be
> untrue.*
> A *Okay, correct.*

RP at 210-11 (emphasis added).

During jury summation, the State's attorney mentioned Officer Kaitlyn

Anderson's testimony regarding Julie Kelly's demeanor:

> And she [Officer Anderson] testified initially that she [Julie Kelly]
> was upset and distraught, and after watching her body camera *she testified
> again that Ms. Kelly was upset and distraught*.

36

RP at 325 (emphasis added). Kevin Kelly objected to the State's argument as mischaracterizing the evidence. The trial court overruled this objection, and the prosecuting attorney continued that Julie was "[u]pset and distraught."

We agree with Kevin Kelly that the prosecuting attorney's comment about Julie Kelly being distraught misrepresented Officer Kaitlyn Anderson's testimony. Although Officer Anderson first characterized Julie as being distraught, Anderson, after reviewing her body camera video, indubitably averred that Julie was not distraught.

We must ask, however, whether the State's mischaracterization of evidence prejudiced Kevin Kelly. After the State's comment, defense counsel immediately objected and the trial court overruled him. When a trial court overrules a timely and specific objection, the court lends an aura of legitimacy to the improper argument. *State v. Allen*, 182 Wn.2d 364, 378, 341 P.3d 268 (2015). Nevertheless, we note that, in response to defense counsel's questioning, Officer Kaitlyn Anderson also avowed that Julie was "very down, choked up, . . . a little jumbled in her thoughts, . . .[and] water-eyed." CP at 210. This unchallenged description of Julie Kelly comes close to, if not echoes, a depiction of Julie being "distraught." The State presented overwhelming evidence of Kevin Kelly's guilt. If the State's attorney had omitted the term "distraught" from his closing argument, the result would not have differed. Therefore, we find no prejudice.

*Issue 10: Whether the State's attorney committed misconduct by vouching for Julie Kelly?*

*Answer 10: No. The prosecuting attorney did not vouch for the credibility of Julie Kelly.*

Kevin Kelly also contends the State's attorney engaged in misconduct by vouching for the veracity of Julie Kelly when emphasizing the distraught nature of Julie when interviewed by law enforcement. The State argues that commenting that Julie was distraught did not constitute vouching, as it never intimated that the jury should believe her testimony based on her distress. We agree. During closing, the State argued that Julie was credible because of no reason to lie, but the State did not argue that her emotional condition added to her veracity.

Jury Unanimity Instruction

Kevin Kelly asserts that the trial court violated his right to jury unanimity when it failed to issue a *Petrich* instruction to ensure that the jury unanimously agreed as to the conduct that formed the basis for his conviction. Kelly highlights that the State, by presenting testimony about other calls or texts from the jail to Julie Kelly, presented indirect evidence that he had asked other inmates to contact Julie. Because each of these purported contacts could constitute separate no contact order violations, Kelly argues that the State should have elected the one discrete act on which the jury must unanimously rely when reaching a verdict.

38

The State responds that Kevin Kelly never requested a *Petrich* instruction nor included one in his proposed instructions, and thus he invited any alleged error by the trial court. The State further argues that a unanimity instruction was unnecessary because it only charged Kelly with violating a no-contact order arising from Julie Webster's text message on May 14, 2019. According to the State, although it presented evidence of earlier phone calls from the jail, it did not argue that these phone calls occurred on May 14, 2019. Finally, the State maintains that, in its opening and closing arguments, its counsel expressed that the government only sought to prove one act which constituted Kelly's crime.

Kevin Kelly replies that he played no role in creating the trial court's error in withholding a jury unanimity instruction. Kelly also rejoins that an accused may raise the issue of jury unanimity for the first time on appeal.

*Issue 11: Whether Kevin Kelly invited any error in the trial court's failure to deliver a jury unanimity instruction?*

*Answer 11: No.*

The invited error doctrine precludes a criminal defendant from seeking appellate review of an error he helped create, even when the alleged error involves constitutional rights. *State v. Carson*, 179 Wn. App. 961, 973, 320 P.3d 185 (2014), *aff'd*, 184 Wn.2d 207, 357 P.3d 1064 (2015). To be invited, the error must be the result of an affirmative, knowing, and voluntary act. *State v. Mercado*, 181 Wn. App. 624, 630, 326 P.3d 154

(2014).  The defendant must materially contribute to the error challenged on appeal by engaging in some type of affirmative action through which he knowingly and voluntarily sets up the error.  *In re Personal Restraint of Call*, 144 Wn.2d 315, 328, 28 P.3d 709 (2001).  The State bears the burden of proof on invited error.  *State v. Thomas*, 150 Wn.2d 821, 844, 83 P.3d 970 (2004).

Kevin Kelly did not request or submit a unanimity instruction at trial. Nevertheless, he took no affirmative and knowing act that led to any error.  One may complain on appeal about the trial court's failure to give a unanimous jury instruction without objecting to this failure at trial.  *State v. Crane*, 116 Wn.2d 315, 325, 804 P.2d 10 (1991), *abrogated on other grounds by In re Pers. Restraint of Andress*, 147 Wn.2d 602, 56 P.3d 981 (2002).  *Crane*'s teaching clashes with the State's contention that the accused must submit or request a jury unanimity instruction in order to claim error on appeal.  We conclude that Kevin Kelly did not invite any error.

*Issue 12: Whether the trial court erred by failing to provide the jury with a* Petrich *instruction to ensure jury unanimity as to the conduct that formed the basis for Kevin Kelly's conviction, contrary to Kelly's right to jury unanimity.*

*Answer 12: No.*

The accused may raise an error initially on appeal if the error invades a fundamental right of the accused.  *State v. Watkins*, 136 Wn. App. 240, 244, 148 P.3d

1112 (2006). A defendant has a constitutional right to a unanimous jury verdict. *State v.*

*Kitchen*, 110 Wn.2d 403, 409, 756 P.2d 105 (1988).

In Washington, the jury may convict an accused only when a unanimous jury

concludes that the defendant committed the criminal act charged in the information.

*State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984), *abrogated on other grounds*

*by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988). When the State presents

evidence of multiple acts that could constitute the crime charged, the State must identify

for the jury the act on which to rely during deliberations or the court must instruct the

jury to agree on a specific criminal act. *State v. Rodriquez*, 187 Wn. App. 922, 936, 352

P.3d 200 (2015). If the trial court fails to provide a unanimity instruction and the State

fails to elect a particular act, constitutional error usually follows because different jurors

could have relied on different acts in reaching a verdict. *State v. Rodriquez*, 187 Wn.

App. 922, 936 (2015). This court presumes that the omission of a unanimity instruction

prejudices the defendant. *State v. Coleman*, 159 Wn.2d 509, 512, 150 P.3d 1126 (2007).

The State may overcome this presumption by demonstrating that no rational juror could

have a reasonable doubt as to any of the incidents alleged. *State v. Coleman*, 159 Wn.2d

509, 512 (2007).

At trial, Officer Alisha Nguyen explained that each Spokane County jail inmate

possesses a unique pin number used to initiate phone calls. Officer Nguyen discovered

that Julie Kelly received ten telephone calls from the jail, but that Kevin Kelly's pin

41

number had not been used for any of these calls. The respective callers used three inmates' pin numbers to contact Julie: Brendan Dalla, Anton Santrone, and Kelly's cellmate, Alexander Maravilla. All three men resided in Kelly's cellblock. Each of the ten calls may have constituted a violation of the no-contact order.

The to-convict instruction informed the jury that, to convict Kevin Kelly, the State needed to prove beyond a reasonable doubt that "on or about May 14, 2019," with knowledge of the existence of a no-contact order, Kelly violated the order. CP at 41. In closing, the State mentioned that Julie Kelly received the ten phone calls from the Spokane County jail before and during that period in which Julie received the text message. Nevertheless, the State never alleged or argued that any of the ten phone calls occurred on May 14, 2019.

Kevin Kelly analogizes *State v. Williams*, 136 Wn. App. 486, 150 P.3d 111 (2007). The State charged Anthony Williams with first degree burglary and alleged that he assaulted one of two men listed in the information. The jury found Williams guilty as charged. On appeal, Williams assigned error to the trial court's failure to instruct the jury that it must unanimously find that Williams assaulted one of the men. This court disagreed with the State that it elected to rely on the assault against one of the men rather than the other. The court wrote:

> While the record indicates that the State emphasized the assault against Johnson to a greater extent than the assault against Otis, the State did not expressly elect to rely only on the assault against Johnson in

seeking the conviction.

*State v. Williams*, 136 Wn. App. at 497.

Kevin Kelly argues that, as in *State v. Williams*, the State may have emphasized the text message from Julie Webster, but the State did not expressly tell the jury to only consider Kelly's alleged act of requesting Webster to send the text. The State distinguishes *State v. Williams* by arguing that, in the former case, the State charged that, "in the course of the burglary, Williams assaulted 'a person, to wit: Makeba Otis and Leslie Johnson.'" *State v. Williams*, 136 Wn. App. at 491. Unlike the State in *Williams*, the State of Washington only charged Kevin Kelly with violating a no-contact order "on or about May 14, 2019." CP at 9.

During closing, the State listed the elements needed to be proved to convict Kevin Kelly. When discussing element three, whether Kelly knowingly violated the no-contact order, the State's attorney commented: "Here Ms. Kelly received a text message that she knows is from her husband, Kevin Kelly." RP at 298. Though the State also discussed the previous phone calls allegedly from Kelly during closing argument, the prosecuting attorney only referenced them for the purpose of explaining that, "when he couldn't get through to her by phone, he resorted to a text message." RP at 299.

We conclude that the State sufficiently identified only one act as the basis for the prosecution and that no rational juror could have a reasonable doubt as which of the incidents the State sought to prove. The State did not charge Kevin Kelly with

committing multiple acts. The to-convict instruction required the jury to find that Kelly

violated the order on May 14, 2019, the date of the text message from Julie Webster.

Kevin Kelly insists that, to elect a particular act, the State must "clearly and

explicitly" do so, citing *State v. Carson*, 184 Wn.2d 207 (2015). Appellant's Opening Br.

at 31. In *Carson*, the state high court recognized that, during its closing argument, the

State "clearly and explicitly" elected the three acts on which it relied for conviction.

*State v. Carson*, 184 Wn.2d at 228. Nevertheless, the Supreme Court did not rule that the

State must "clearly and explicitly" make its election. No other decision stands for such a

proposition. Rather, the State needs to "'tell the jury which act to rely on in its

deliberations.'" *State v. Rodriquez*, 187 Wn. App. 922, 936 (2015) (quoting *State v.

Kitchen*, 110 Wn.2d 403, 409, 756 P.2d 105 (1988)).

Cumulative Error

Finally, Kevin Kelly asserts that the cumulative effect of the errors during trial

deprived him of a fair trial. The cumulative error doctrine may warrant reversal, even if

each error standing alone would otherwise be considered harmless. *State v. Weber*, 159

Wn.2d 252, 279, 149 P.3d 646 (2006). This doctrine does not apply when "the errors are

few and have little or no effect on the outcome of the trial." *State v. Weber*, 159 Wn.2d

252, 279 (2006).

We only find one error, and we conclude the error was harmless. Therefore, we

reject Kevin Kelly's cumulative error contention.

CONCLUSION

We affirm Kevin Kelly's conviction for violation of a no-contact order.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Staab, J.